Donald BERGESON, et al.,
petitioners, Appellants,

v.

UNITED STATES FIDELITY AND
GUARANTY COMPANY,
Respondent.

and

Donald BERGESON, Respondent,

v.

DANNY'S CONSTRUCTION COMPANY
and U.S. Fidelity & Guaranty
Company, Relators.

Nos. C2–86–1048, CX–87–658.

Supreme Court of Minnesota.

Nov. 6, 1987.

Rehearing Denied Dec. 15, 1987.

Joseph T. Herbulock, Minneapolis, for appellants.

Steven J. Cahill, Moorhead, for Danny's Const. and U.S. Fidelity.

SIMONETT, Justice.

These are two cases consolidated on appeal. In the first appeal, we agree with the Minnesota Court of Appeals that the employer's insurer was entitled to summary judgment dismissing the employee's civil action for alleged intentional obstruction by the insurer of the employee's claim for workers' compensation benefits. In the second appeal, we reject the employer-insurer's objections and agree with the Workers' Compensation Court of Appeals decision awarding compensation and penalties. In other words, in both cases we affirm.

On May 17, 1978, employee Donald Bergeson sustained a serious injury, rendering him quadriplegic, while working for employer Danny's Construction Company. The compensation carrier for the employer, United States Fidelity & Guaranty Company, immediately opened a file on the case.

Through John U. Mitchell, its claims manager stationed in Duluth, U.S.F. & G. promptly admitted primary liability and began payments for temporary total disability and medical expenses. Mitchell, who twice visited employee Bergeson in the hospital, knew Bergeson was seriously injured and, at least by the fall of 1978, admits he knew Bergeson was quadriplegic. Mitchell further authorized payment for in-home nursing services provided by Clearwater County. He nonetheless failed to authorize payments for permanent partial disability, or for the nursing services rendered to Bergeson by his wife. Mitchell now admits he was required under Minn.Stat. § 176.021, subd. 3 (1978)[1] and § 176.135 (1986)[2] of the Workers' Compensation Act to make these payments. He characterizes his failure to do so as "unintentional oversight."

In 1984, the Bergesons retained legal counsel and their lawyer sent a letter to U.S.F. & G. demanding payment of all permanent partial disability benefits accruing from the date of injury, and also payment for the wife's nursing services. Mitchell promptly wrote to his superior requesting that these payments be authorized and, after obtaining an opinion from legal counsel, paid Bergeson for 350 weeks of permanent partial disability and also paid for the wife's nursing services. In January 1985, U.S.F. & G. paid an additional 150 weeks of permanent partial disability benefits. Both payments included interest from January 1, 1979, to the date of payment.

Donald Bergeson then brought proceedings against U.S.F. & G. in the workers' compensation court. In addition, Donald and his wife, Signe, brought a civil action against the insurer for money damages under Minn.Stat. § 176.82 (1986),[3] as well

---

1. Minn.Stat. § 176.021, subd. 3 (1978), provides in pertinent part: "All employers shall commence payment of the compensation at the time and in the manner prescribed by this chapter without the necessity of any agreement or any order of the division."

2. Minn.Stat. § 176.135, subd. 1 (1986), provides in pertinent part: "The employer shall pay for the reasonable value of nursing services by a

member of the employee's family in cases of permanent total disability."

3. Minn.Stat. § 176.82 (1986) provides:

Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or *in any manner intentionally obstructing an employee seeking workers' compensation benefits* is liable in a civil action for damages incurred by the em-

as a common law claim for damages for intentional infliction of emotional distress.

In the workers' compensation proceeding, the compensation judge awarded Bergeson additional benefits under Minn. Stat. § 176.101, subd. 3 (1978) (repealed 1983),[4] and penalties pursuant to Minn.Stat. § 176.225 (1986).[5] The WCCA affirmed the lower compensation court, and the employer-insurer by certiorari bring the matter to us.

In the civil suit, after allowing Bergeson time for discovery, the trial judge granted U.S.F. & G.'s motion for summary judgment. The judge also dismissed the claim for intentional infliction of emotional distress. The Bergesons appealed, and the Minnesota Court of Appeals affirmed the trial court. *Bergeson v. United States Fidelity & Guaranty Co.*, 398 N.W.2d 75 (Minn.App.1986). We granted Bergeson's petition for further review. We first address the issues presented by the civil action.

## I.

Donald Bergeson brings his civil suit under Minn.Stat. § 176.82 (1986), which gives an employee a cause of action against "any person" for "intentionally obstructing" an employee's seeking of compensation benefits, and allows recovery of damages for diminution in benefits plus attorney fees, costs, and punitive damages.[6] In *Kaluza*

*v. Home Insurance Co.*, 403 N.W.2d 230 (Minn.1987), we held this civil action is separate and independent from any penalties that might be awarded under the Workers' Compensation Act, specifically under section 176.225, for unreasonably or vexatiously delaying or denying payment of benefits. In *Kaluza,* we held that the injured worker could recover damages from his employer's insurer under section 176.82 if he could prove the facts he alleged. Although not addressed explicitly, we also held that the civil action against "any person" includes an action against the compensation carrier.

The issue here is whether the Bergesons have made a sufficient factual showing of "intentionally obstructing" by U.S.F. & G. to escape an adverse summary judgment. We do not think that they have.

■ One of the principles of workers' compensation is that the compensation act is considered to be, with rare exceptions, the injured worker's exclusive remedy. *See, e.g., Hildebrandt v. Whirlpool Corp.*, 364 N.W.2d 394, 396 (Minn.1985); Minn. Stat. § 176.001 (1986). Recognizing that employers and insurers may at times unreasonably delay, deny, or frustrate the payment of benefits, the legislature has provided in the Workers' Compensation Act for the imposition of penalties up to 25 percent of the total compensation awarded. Minn.Stat. § 176.225, subd. 1 (1986). This

---

ployee including any diminution in workers' compensation benefits caused by a violation of this section including costs and reasonable attorney fees, and for punitive damages not to exceed three times the amount of any compensation benefit to which the employee is entitled. Damages awarded under this section shall not be offset by any workers' compensation benefits to which the employee is entitled. [Emphasis added.]

4. Minn.Stat. § 176.101, subd. 3 (1978), provided for an award of permanent partial disability, "subject to a maximum compensation equal to the statewide weekly wage" for each part of the body disabled by the work-related injury.

5. Minn.Stat. § 176.225, subd. 1 (1986), provides:
    Upon reasonable notice and hearing or opportunity to be heard, the division, a compensation judge, or upon appeal, the workers' compensation court of appeals or the supreme court may award compensation, in addition to the total amount of compensation award,

of up to 25 percent of that total amount where an employer or insurer has:
    (a) instituted a proceeding or interposed a defense which does not present a real controversy but which is frivolous or for the purpose of delay; or,
    (b) unreasonably or vexatiously delayed payment; or,
    (c) neglected or refused to pay compensation; or,
    (d) intentionally underpaid compensation; or
    (e) unreasonably or vexatiously discontinued compensation in violation of section 176.-242.

6. *See* footnote 3, *supra.* Bergeson also alleged a common law count for intentional infliction of emotional distress. The trial court dismissed this claim and Bergeson does not appeal that dismissal.

penalty, plus the imposition of interest, usually will provide an appropriate remedy for loss sustained by an insurer's foot-dragging or neglect. *See Olson v. Horton,* 258 N.W.2d 610, 614 n. 5 (Minn.1977). Our legislature, however, has afforded the aggrieved worker a further remedy under Minn.Stat. § 176.82, allowing a civil action for money damages for "intentionally obstructing" an employee seeking benefits. We think this civil action is intended to cover those situations where the insurer's delay or denial of benefits goes beyond unreasonableness, neglect, or obstinance. This view, we believe, keeps the remedies provided by sections 176.82 and 176.221 separate and distinguishable, and gives due deference to the exclusivity scheme of the Workers' Compensation Act. The statute's explicit allowance of treble punitive damages in the civil action, a kind of damages reserved traditionally for conduct which is outrageous, also supports this view.

■ In *Kaluza,* we construed the phrase "intentionally obstructing," saying that "intentional" refers to the actor desiring to cause the consequences of his act and that "obstructing" means to impede or hinder. This obstructing may occur "in any manner," and so is not limited to active as opposed to passive conduct. We conclude, therefore, that a cause of action under section 176.82 lies where a person, such as an insurer, obstructs or hinders, whether by deliberate action or inaction, the receipt of benefits due the injured worker and does so in a manner that is outrageous and extreme, or, to put it another way, in a manner which is egregiously cruel or venal. We hold, further, that this conduct must be proven by evidence that is clear and convincing. *Cf.* Minn.Stat. § 549.20, subd. 1 (1986) (punitive damages for willfully indifferent conduct must be proven by clear and convincing evidence).

Other courts have similarly circumscribed employee tort actions against employer-insurers, which are outside the Workers' Compensation Act. In *Unruh v. Truck Insurance Exchange,* 7 Cal.3d 616, 498 P.2d 1063, 102 Cal.Rptr. 815 (1972), California allowed a tort action by an employee against an insurer where the investigator had duped the employee in a particularly cruel way into performing activities inconsistent with her claims of disability.[7] Subsequent California decisions have carefully limited the *Unruh* departure from the policy of statutory exclusivity. *See Ricard v. Pacific Indemnity Co.,* 132 Cal.App.3d 886, 183 Cal.Rptr. 502 (1982); *Everfield v. State Compensation Insurance Fund,* 115 Cal.App.3d 15, 171 Cal.Rptr. 164 (1981). Indeed, the Ninth Circuit has warned that "[i]f plaintiffs could avoid the jurisdictional limitation merely by alleging that the insurer had improperly refused to pay, the *Unruh* exception would soon subsume the statutory mandate." *Goetz v. Aetna Casualty & Surety Co.,* 710 F.2d 561, 565–66 (9th Cir.1983). Our own court of appeals has recently taken this approach. *Denisen v. Milwaukee Mutual Ins. Co.,* 360 N.W.2d 448, 450 (Minn.App.1985). Professor Larson, noting that allowing a civil action for intentional wrongdoing whenever payment is delayed would "shatter the exclusiveness principle," states that "awareness of this possibility has undoubtedly been one reason for the reluctance of courts to recognize this tort except in cases of egregious cruelty or venality." Larson, *Workmen's Compensation Law* § 68.34(c) at 13–145 (1987).

■ In this case, employee Bergeson argues that his quadriplegic condition was known to the insurer; that the insurer knew the law required prompt payment of permanent partial benefits and spousal nursing expense for a person in his condition; and, therefore, "by definition," failure to pay the benefits was an intentional obstruction.[8] U.S.F. & G. contends that it

---

**7.** Other cases, in addition to our own *Kaluza* decision, have affirmed the *Unruh* premise that certain egregious conduct by an insurer may justify an independent tort action. *See Hollman v. Liberty Mutual Ins. Co.,* 712 F.2d 1259 (8th Cir.1983); *Coleman v. American Universal Ins.* Co., 86 Wis.2d 615, 273 N.W.2d 220 (1979) (independent tort of bad faith); *Stafford v. Westchester Fire Ins. Co.,* 526 P.2d 37 (Alaska 1974).

**8.** The employee claims permanent partial benefits in the amount of $484,500 were withheld. U.S.F. & G. paid $76,720 for the wife's past

never refused to pay because the benefits had never been asked for, and that claim manager Mitchell failed to authorize payments for the nursing services rendered by Mrs. Bergeson because he was unaware they were being provided in addition to the nursing care provided by the county. The insurer points out it did, promptly and voluntarily, commence payments for temporary total disability and in-home county nursing care once the claim for additional benefits was made.

Obviously, the insurer "intended" not to pay the additional benefits because, in fact, it did not pay them. But this is not the kind of intent that makes an insurer's conduct outrageous.[9] The insurer must also desire, for unworthy motives, to deprive the injured worker of benefits. The insurer says it was never asked to make the additional payments until, after 6 years elapsed, the Bergesons retained counsel and made a demand. While Bergeson's failure to ask for permanent partial disability benefits does not excuse U.S.F. & G., which had already undertaken payments of temporary total benefits, from paying the additional benefits, there would be more reason to characterize the insurer's conduct as indefensible if the Bergesons had requested additional benefits and those benefits had nonetheless been denied or delayed. Bergeson suggests U.S.F. & G. paid the initial benefits to beguile him into believing there were no more benefits owing; this, of course, would be despicable, but there is no proof this was the case. It is standard practice for claim managers to set up a reserve on claims to cover potential exposure; significantly, here Mitchell's failure to make a provision in his reserve for any permanent partial disability or spousal

nursing care supports his claim that he simply had not, inexplicably, thought about the additional exposure. Nor does the insurer's file reflect any awareness of the possibility of such claims prior to the time Bergeson's attorney made his demand. The record is devoid of any explicit evidence tending to show either Mitchell or U.S.F. & G. intended to cheat or underpay Bergeson. There was no evidence from which a factfinder could find by clear and convincing evidence that the insurer ever intended to deceive the employee. We must, therefore, as did the court of appeals, affirm the granting of summary judgment by the trial judge.

## II.

1. In the second appeal, the employer, Danny's Construction, and its compensation insurer, U.S.F. & G., ask us to overturn the WCCA's award of additional benefits and penalties under the Workers' Compensation Act. Relators first contend the compensation courts erred in their computation of the permanent partial disability owed to Bergeson. The compensation judge determined the award by aggregating the disability payments scheduled for the loss of each function or body part specified in Minn.Stat. § 176.101, subd. 3 (1978) (repealed 1983). He then increased the resulting total by 15 percent[10] to arrive at a total of 1,516 weeks of benefits. U.S.F. & G. has so far paid only 500 weeks of benefits, claiming that section 176.101, subd. 3(4) limits Bergeson's recovery to "that proportion of 500 weeks which is the proportionate amount of permanent partial disability caused to the entire body" by an injury to any internal organ.[11] Relators

---

nursing services after a demand for payment was made on the insurer.

**9.** "[I]ntentionally underpaid compensation" is a grounds for imposing penalties on the insurer pursuant to Minn.Stat. § 176.225, subd. 1(d) (1986). It is the outrageousness of the "intentionally obstructing" of payment under section 176.82 that distinguishes the civil action and makes it separate and independent of the administrative remedy of imposing a penalty.

**10.** Minn.Stat. § 176.101, subd. 3(46) (1978), provided in pertinent part: "In cases of permanent

partial disability caused by simultaneous injury to two or more members, the applicable schedules in this subdivision shall be increased by 15 percent."

**11.** Minn.Stat. § 176.101, subd. 3(40) (1978), read:

For permanent partial disability resulting from injury to any internal organ, including the heart, 66⅔ percent of the daily wage at time of injury for that proportion of 500 weeks which is the proportionate amount of permanent partial disability caused to the en-

argue that the spinal cord is an extension of the brain and a part of the central nervous system, and that the brain is an internal organ. They claim the compensation courts erred by awarding benefits in an amount exceeding the 500–week "limitation" specified in section 176.101.

 Relators' position is contrary to well-established Minnesota case law. In *Lerich v. Thermo Systems, Inc.*, 292 N.W. 2d 741 (Minn.1980), we affirmed an award to an employee rendered quadriplegic calculated by adding together the scheduled sums for each disabled body part. We there rejected the argument relators advance in this case and noted the unfairness inherent in a compensation scheme that would award a severely injured employee less money than an employee whose injuries were less severe simply because the former employee sustained injuries to an internal organ while the latter employee did not. We concluded that the legislature in all probability did not intend such an unfair result. *Id.* at 743. The WCCA has correctly applied *Lerich* to hold that permanent partial disability awarded for brain damage does not preclude an additional award for members of the body disabled as a result of the brain injury. *Crowson v. Valley Park, Inc. and U.S.F. & G. Co.*, 33 W.C.D. 127 (1980); *Mack v. City of Minneapolis*, 33 W.C.D. 289 (1980). These decisions are not ambiguous and were correctly applied by the compensation courts to the present case. We affirm.

2. Relators also contend the compensation courts erred by awarding penalties for U.S.F. & G.'s negligent failure to pay permanent partial disability benefits.[12] We find relators' position surprising in light of the 6–year delay in paying Bergeson any of the permanent partial disability payments clearly owed to him. Indeed, the insurer has not paid most of those benefits yet, and it justifies its failure to do so by advancing an argument rejected by this court in 1980. *See Lerich, supra.* The WCCA quite properly awarded Bergeson the maximum penalties allowed under the statute, and we affirm this award as well.

3. Finally, the parties dispute whether the WCCA properly remanded the Bergeson case to the compensation judge for further findings regarding the percentage of disability to Bergeson's back. Minn. Stat. § 176.421, subd. 6(5) (1986), allows the WCCA to remand cases to the compensation judge. The WCCA did so in this case because the compensation judge did not say how the evidence supported his conclusion as to the percentage of disability the spinal cord injury caused to Bergeson's back. This was appropriate. Accordingly, we also affirm the WCCA's decision to remand on the one issue.

Employee is allowed $600 attorney fees.

Affirmed.

SCOTT and KELLEY, JJ., took no part in the consideration or decision of this case.

---

tire body by the injury and is determined from competent testimony adduced at a hearing before a compensation judge, a commissioner, or the workers' compensation court of appeals.

**12.** Such penalties are authorized in section 176.-225, in an amount up to 25 percent of the total compensation award. The compensation judge awarded Bergeson penalties amounting to 10 percent of the award, and the WCCA increased that amount to 25 percent.