Dennis J. **FLAHERTY**, Respondent,

v.

James **LINDSAY**, Chief of Police, Gerald S. Splinter, City Manager, and City of Brooklyn Center, Appellants.

No. C5-89-2175.

Supreme Court of Minnesota.

March 22, 1991.

Richard J. Schieffer, Johnson & Wood, Mound, Peter J. Pustorino, Jeffrey J. Lindquist, Pustorino, Pederson, Tilton & Parrington, Minneapolis, for appellants.

Daniel B. O'Leary, Mansur, O'Leary & Gabriel, P.A., St. Paul, for respondent.

Karla R. Wahl, Minneapolis, for amicus curiae Mn. Trial Lawyers Ass'n.

Robyn N. Moschet, Robert L. McCollum, McCollum & Daly, Ltd., Bloomington, for amicus curiae Insurance Federation of Minnesota.

Carla Heyl, St. Paul, for amicus curiae League of Mn. Cities.

Robert J. Afton, J. David Abramson, Minneapolis City Atty., Minneapolis, for amicus curiae City of Minneapolis.

KEITH, Chief Justice.

The City of Brooklyn Center and Chief of Police James Lindsay [1] appeal the court of appeals' affirmance of the trial court's judgment awarding damages for emotional distress, attorneys' fees, and punitive damages to injured employee Dennis Flaherty for violation of Minn.Stat. § 176.82 (1990), which prohibits the intentional obstruction of an employee seeking workers' compensation benefits. The trial court found the City offered Flaherty the position of Code

---

1. City Manager Splinter was found not liable by the trial court and is not a party to this appeal.

Enforcement Officer in bad faith, based on the City officials' belief the City would be relieved of further obligation to pay workers' compensation if Flaherty refused the job. We find the employer's conduct in dealing with Mr. Flaherty's post-injury employment status, while by no means commendable, did not result in an obstruction of benefits contemplated by Minn.Stat. § 176.82 (1990).

I

Dennis Flaherty served as a patrol officer with the City of Brooklyn Center beginning in May of 1974. In June 1981, while exiting his vehicle to respond to a call for assistance, he slipped and injured his left knee. After Flaherty resumed patrol duties in October of 1981, he experienced considerable pain and was restricted in the use of his knee. The City accommodated the injury by assigning Flaherty to a light duty position which involved administrative work, citizens' complaints, and radar enforcement work. Flaherty continued medical treatment, and was released to perform full-time patrol duties in May of 1984 by his treating physician, Dr. Borgen.

Flaherty again began to experience pain in his knee after assuming full-time patrol duties. Specifically, his assignment to a patrol car smaller than others in the City's fleet aggravated the injury. When he requested assignment to a larger car on June 28, 1984, Flaherty was sent home as unfit for duty. His captain informed Flaherty that he would be able to resume full-time patrol duties only if he could do so without medical restriction. Dr. Borgen was unwilling to release Flaherty for work without restriction.

Soon thereafter Flaherty began receiving workers' compensation wage loss benefits. The City had a policy of supplementing workers' compensation with accrued sick leave and vacation time, so that while away from work Flaherty received an amount equivalent to his regular salary, including raises. These benefits were never inter-rupted or delayed during the period of entitlement.

Flaherty had surgery on his knee in December of 1984. In the spring of 1985 Flaherty's Qualified Rehabilitation Consultant (QRC), Cathy Erickson, met with City officials regarding alternate job assignments for Flaherty. Flaherty was not invited to these meetings and the City instructed Erickson not to inform Flaherty of the results. Flaherty requested a change in QRC in May 1985. On June 28, 1985, Flaherty received a letter offering him the position of code enforcement officer (CEO). Essentially a dog-catching and ticket-writing job, the CEO position in Brooklyn Center generally is filled by college students who are interested in eventually doing police work. The position requires a high school diploma and a valid Minnesota driver's license. Flaherty had a degree in criminal justice studies from the University of Minnesota and a few credits toward a master's degree when offered the position. The annual salary for code enforcement officer is $16,484; Flaherty was making over $30,000 as a patrol officer.

Flaherty contested the suitability of the position in a workers' compensation administrative hearing. On August 14, 1985, Rehabilitation and Medical Specialist Brezinski found the job unsuitable and the City did not challenge that determination. The City terminated Flaherty's employment for medical reasons effective November 1, 1985, when his sick leave and vacation benefits were cashed out. Statutory workers' compensation benefits continued until July of 1986 when Flaherty started work in another position in the law enforcement field.

Flaherty brought an action under Minn. Stat. § 176.82 (1990), claiming Police Chief Lindsay and City Manager Gerald Splinter intended to obstruct his receipt of workers' compensation benefits by offering a job, the rejection of which they thought would relieve the City of workers' compensation obligations.[2] In briefs filed with this court,

_____

2. Under the law in effect on the date of Flaherty's injury, if an employer fails to give an injured worker a suitable job, the employer is obligated to pay the worker temporary partial disability benefits at the temporary total rate so long as the employee makes a reasonably dili-

Flaherty also alleged an obstruction in the City's interference with proper rehabilitation services in the period following June 28, 1984.

The trial court found the City's offer was in bad faith, evidenced by, among other things, the secrecy surrounding the job offer, the "obvious disregard" of the opinion of the QRC regarding suitability, Lindsay's statement that he bet Flaherty would not accept the job, and Lindsay's statement that Flaherty had no choice but to accept the position or lose his workers' compensation benefits. As to the delay in rehabilitation services, the trial court found the City controlled the actions of the QRC to the extent that job search activities were thwarted, but the trial court did not award compensatory damages on this basis. The court also found Flaherty had not suffered any reduction or delay in workers' compensation benefits, but awarded Flaherty $10,000 in compensatory damages for emotional distress, $44,900 in attorneys' fees, and $50,000 in punitive damages. The Court of Appeals affirmed the award. *Flaherty v. Lindsay*, 457 N.W.2d 771 (Minn.App.1990). In its appeal the City claims a job offer that results in no delay or reduction of benefits cannot be construed as an obstruction under Minn.Stat. § 176.82.

## II

■ The trial court found the City's bad faith in offering the CEO position constituted an obstruction of Flaherty's receipt of workers' compensation benefits. Minn. Stat. § 176.82 (1990) provides:

Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages incurred by the employee including any diminution in workers' compensation benefits caused by a violation of this section including costs and reasonable attorney fees, and for punitive damages not to exceed three times the amount of any compensation benefit to which the employee is entitled. Damages awarded under this section shall not be offset by any workers' compensation benefits to which the employee is entitled.

This statute prohibits two specific types of conduct: retaliatory discharges (or threatened discharges) and obstructions of workers' compensation benefits. We have defined an obstruction under this statute as an impediment to or frustration of the receipt of benefits. *Kaluza v. Home Ins. Co.*, 403 N.W.2d 230, 234 (Minn.1987) (citation omitted). A plain reading of the statute also suggests some actual denial or disruption in the receipt of benefits must occur to warrant recovery; normally, such actions involve the denial of monetary benefits. In *Kaluza*, the insurer's outright refusal to pay benefits after falsely accusing the employee of forging records of job-seeking activities constituted an obstruction. 403 N.W.2d at 233–34. In contrast, the trial court found no disruption in Flaherty's receipt of wage loss benefits. While an offer of unsuitable employment results in administrative proceedings within the workers' compensation system, as it did in Flaherty's case, a single offer by itself does not necessarily result in a disruption or frustration in the receipt of benefits. *See supra* note 2. The City's offer of unsuitable employment, while offensive, did not result in an obstruction of benefits under the plain language of section 176.82.

■ Flaherty also alleges an obstruction of benefits in the City's delay in facilitating

---

gent effort to obtain suitable gainful employment. Minn.Stat. § 176.101, subd. 2 (1980). Although an injured worker's unreasonable refusal of a good faith offer of suitable employment results in the suspension of benefits for the duration of the refusal, a bad faith offer of unsuitable employment does not result in a loss of benefits. *Johnson v. State, Dep't of Veterans Affairs*, 400 N.W.2d 729 (Minn.1987); *Shogren v. Bethesda Lutheran Medical Center*, 359 N.W.2d 595 (Minn.1984). The trial transcript indicates the parties erroneously understood that revisions enacted in 1983 governed Flaherty's compensation rights. Under either the 1981 or 1983 laws, however, as applied to the facts of this case, any discharge of workers' compensation liability depends on the offered alternate employment being suitable. Accordingly, the City officials' belief that the City could relieve itself of workers' compensation liability through an offer of unsuitable employment was erroneous.

his job search, which he claims could have begun as soon as October 1984. Although the trial court did find that the City controlled the actions of the QRC to the extent that job search and rehabilitation assistance was delayed, there was no explicit finding that this constituted an obstruction under the statute, and no damages were awarded for loss of proper rehabilitation services. Counsel for Flaherty admitted at trial that following a November 1984 meeting regarding his situation, further negotiations were put on hold for several months due to Flaherty's impending surgery in December 1984. After this surgery, Flaherty's doctor indicated it would take at least six months before the results of the surgery would be known. Any determination whether Flaherty could return as a patrol officer, or physically perform in other positions, would have been premature during the period Flaherty claims his job search activities were delayed. Flaherty did participate in physical therapy during this period and continued to receive wage loss and medical payment benefits. Surely an employer's interference with the services of the QRC might hinder proper rehabilitation. However, we need not decide whether such interference constitutes an obstruction of benefits under section 176.82, as it appears Flaherty's changing physical condition during this period was the controlling impediment to an aggressive job search.

■ Respondent argues for a construction of the statute which includes within its scope not just an obstruction of benefits, but also an attempt to obstruct benefits. If the legislature had intended to include attempts in the liability encompassed by this statute, it would have included language of attempt. *Cf. Klemetsen v. Stenberg Constr. Co.*, 424 N.W.2d 70, 73 (Minn. 1988) (construing as language of attempt Minn.Stat. § 176.205 (1986), which reads, "a person who creates or executes any fraudulent scheme, artifice, or device to enable the person to execute work without being responsible to the worker"). A construction that included attempts at obstructing benefits would contravene our caselaw which interprets section 176.82 narrowly. *See Bergeson v. United States*

*Fidelity & Guar. Co.*, 414 N.W.2d 724, 727 (Minn.1987) (requiring clear and convincing evidence of conduct "beyond unreasonableness, neglect, or obstinance," and "in a manner that is outrageous and extreme * * * egregiously cruel or venal" to maintain an action under this statute). Moreover, construing a job offer made under factual circumstances similar to this case as an attempted obstruction covered by the statute may deter conduct that the legislature intended to encourage, that of reemployment of injured workers.

A narrow construction of the term 'obstruction' also is required in deference to the mandate of exclusivity set forth in Minn.Stat. § 176.031 (1990) (liability of employer prescribed by workers' compensation act is exclusive of any other liability). Inherent in the principle of exclusivity is the exchange of the employee's right to sue at common law for the employer's assumption of liability for all work-related injuries. Minn.Stat. § 176.001 (1990) (compensation system based on mutual renunciation of common law rights and defenses by employers and employees). As we noted in *Bergeson*, allowing a civil action for *any* wrongdoing by the employer would shatter the exclusivity principle. 414 N.W.2d at 727. Accordingly, actions under section 176.82 appropriately require an actual obstruction of benefits.

Having determined no obstruction of workers' compensation benefits occurred, the award of the trial court is reversed.

GARDEBRING, J., took no part in the consideration or decision of this case.