# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1531

_____

Heather A. Nunn,

        Appellant,

v.

Noodles & Company;
Zurich American Insurance Company,

        Appellees.

\*    Appeal from the United States
\*    District Court for the
\*    District of Minnesota.

_____

Submitted: November 15, 2011
Filed: March 22, 2012

_____

Before WOLLMAN, MURPHY, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

      Heather Alexandra Nunn sued her employer, Noodles & Company, and its workers' compensation insurer, Zurich American Insurance Company, for intentional obstruction of workers' compensation in violation of Minnesota statute § 176.82. Noodles and Zurich moved for summary judgment, which the district court granted. Jurisdiction being proper under 28 U.S.C. § 1291, this court reverses and remands.

I.

This court states the facts most favorably to Heather A. Nunn.

Nunn was a shift supervisor at a Noodles restaurant in Eagan, Minnesota. In the spring of 2007, Noodles was opening a new restaurant in West St. Paul where Nunn would be assistant manager. Raymond (Ray) Gibson, general manager of the Eagan restaraunt, was Nunn's supervisor. Gibson was to temporarily manage the new restaurant; Eagan's assistant manager Tom Mako was to replace Gibson temporarily as manager in Eagan. Gibson was responsible to train Nunn for her new position.

On May 28, 2007, at about 9:30 p.m., Nunn clocked out, closed the Eagan restaurant, got on her motorcycle, and headed to Gibson's home to meet with Gibson and Mako. Nunn had other plans for the evening and asked to have the meeting rescheduled. Gibson directed her to attend. En route to his home, Nunn ran a red light, making a left turn in front of an oncoming car. She suffered serious injuries, with medical bills over $250,000. Nunn had no health or disability insurance, which Noodles knew.

From the outset of Nunn's workers' compensation case, Zurich's claims representative Tara Draves-Blandin and its attorneys Kristin B. Maland and Patrick T. Grove understood that if Gibson called the meeting for business purposes, Nunn's claim was compensable. Maland told Noodles that. The Noodles area manager testified that Grove also explained to Gibson and Mako the importance of characterizing the meeting as "social."

In June 2007, the area manager answered questions from another executive by consulting Gibson, and copied him on the return email.  The area manager quoted Gibson as telling her that the accident "was not work related" and that Nunn "was meeting with the GM (Ray Gibson) and the AM (Tom Mako) after work for a social gathering."  Gibson told a similar story to Noodles' Vice-President of Human Relations, who passed it on to claims representative Draves-Blandin.

On or shortly before June 24, Gibson gave Draves-Blandin a recorded statement, which contradicted his prior reports.  In this statement, he said that the purpose of the meeting was to discuss work, specifically the new restaurant and training issues.  Gibson said, "It was work," then after prompting, said "work plus additional things."  Gibson also admitted previously conducting off-site business meetings where he gave attendees food and drink.

Despite Gibson's statement, on June 28, Draves-Blandin, after advice from Maland, denied Nunn's workers' compensation claim, stating that Nunn may have been traveling to a social function and "was not ordered or assigned to go to the party."  The denial also stated that all business meetings are held on-site with employees clocked in.

Gibson and Mako were deposed before the workers' compensation trial. Asked his agenda for the meeting, Gibson discussed numerous business-related issues he planned to cover with Nunn and Mako.  Mako's deposition testimony corroborated Gibson's description of the anticipated meeting.  Mako also testified that Nunn did not want to attend the meeting and asked to reschedule it — which Gibson refused to do.  Mako felt the meeting was almost exclusively planned to discuss business issues and made reference to an itinerary or agenda Gibson prepared.  Attorney Grove's correspondence reveals that he thought this information would guarantee

Nunn's victory if introduced in court. Summarizing the depositions of Gibson and Mako in her own words, attorney Maland stated that "the testimony of Ray Gibson and Tom Mako suggests that the meeting on the day of the accident had more of a business flavor than social event . . . ."

Zurich repeatedly discussed settling Nunn's claim. In November 2007, Maland requested a demand to resolve the claim. Citing the deposition testimony, Nunn demanded full payment. Attorney Grove, Draves-Blandin, and two Noodles representatives discussed accepting liability. According to one of the Noodles representatives, Draves-Blandin counseled against accepting liability because the medical expense exposure would be open indefinitely. In January 2008, Draves-Blandin wrote that Nunn's attorney still insisted on full payment.

Nunn obtained an order that Draves-Blandin give a deposition duces tecum. Asked specifically what she learned from Ray Gibson, Draves-Blandin stated three times that he told her the intended meeting was a "social gathering." Draves-Blandin did not reveal that she possessed Gibson's recorded statement to the contrary (despite the duces tecum request for all contacts between Zurich and any Noodles employees). Zurich continued to deny the claim, repeatedly noting Nunn's refusal to negotiate.

In September 2008, Grove wrote a "pre-trial report" to Zurich's adjuster. Grove described the evidence that the off-site get-together was work-related, making it "extremely difficult" to prove that the meeting was not mandatory. Grove also noted that Nunn's attorney would not discuss settlement or mediation.

In his opening statement at the trial of the workers' compensation case in October 2008, Grove told the administrative law judge (ALJ) that the evidence — including the expected testimony of Mako and Gibson — would prove that the

meeting was a social gathering. When asked the purpose of the meeting, Gibson listed numerous personal matters — not mentioned during his deposition — with a brief reference to the new restaurant. Denying a set agenda, Gibson discussed the intersection of the group's personal lives and work, commenting that Mako and Nunn "needed to blow off some steam." Confronted with his deposition testimony describing business issues he intended to cover with Nunn and Mako, Gibson endorsed its truth too. Contrary to his deposition testimony, Gibson admitted that Nunn objected to coming to his home that night. Gibson also admitted that the meeting's purpose was primarily "business."[1]

At trial, Mako asserted that the meeting was "similar to the other get-togethers." Nunn's counsel then reviewed Mako's deposition with him. Mako eventually admitted the business purpose of the intended meeting, as he had described it in his deposition. Like Gibson, Mako stated that Nunn did not want to attend the meeting.

In written closing argument to the ALJ, Grove repeatedly described the intended meeting as a social gathering. Grove argued that both Gibson and Mako testified that the gathering was social in nature, repeating his assertion that Nunn was injured on her way to an "offsite happy hour."

---

[1]Zurich did not make Gibson's first statement available to Nunn or Noodles until the present case. Attorney Grove was deposed in the present case, after the recorded statement became available to all parties. He first testified he was certain he saw Gibson's transcribed statement before trial, but claimed to be unclear when he saw it and whether it was ever disclosed to Nunn. Weeks later, on the second day of his deposition, he stated he had not seen the statement before the deposition in the present case.

In the Findings and Order, the ALJ found that Nunn was expressly requested to attend a business meeting at Gibson's home and that her injury thus arose out of and in the course of her employment. The ALJ concluded that Nunn's injuries were compensable under any one of three different theories of liability, including the dual purpose doctrine. About Gibson, the ALJ observed:

> His deposition testimony, that there was no planned agenda for the meeting and the employee's new position at the West St. Paul store would merely have come up, is simply not believable. . . . His deposition testimony that he scheduled the meeting at his home and the employee voluntarily attended so that she could blow off steam is simply not genuine, self-serving, and lacking in credibility.

## II.

This court reviews de novo a grant of summary judgment. *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 884 (8th Cir. 2009). Summary judgment should be granted when — viewing the facts most favorably to the nonmoving party and giving that party the benefit of all reasonable inferences — the record shows that there is no genuine issue of material fact. *See* **Fed. R. Civ. P. 56(c)**; *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). An issue is "genuine" if the evidence is sufficient to persuade a reasonable *jury* to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "As to materiality, the substantive law will identify which facts are material . . . ." *Id.* At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial. *Id.* at 249. "Our holding that the clear-and-convincing standard of proof should

be taken into account in ruling on summary judgment motions does not denigrate the role of the jury." ***Anderson***, 477 U.S. at 255.

In Minnesota, a worker may sue an entity that, in a manner that is outrageous and extreme, or egregiously cruel or venal, intentionally obstructs the worker's right to benefits. ***Bergeson v. United States Fid. & Guar. Co.***, 414 N.W.2d 724, 727 (Minn. 1987), *interpreting* **Minn. Stat. § 176.82.** The insurer "must also desire, for unworthy motives, to deprive the injured worker of benefits." ***Id.*** at 728. An unfounded refusal to pay, or even a substantial delay in payment, designed to induce settlement qualifies as intentional obstruction in an outrageous and extreme, or egregiously cruel or venal manner. ***Kaluza v. Home Ins. Co.***, 403 N.W.2d 230, 233-34 (Minn. 1987) (holding that an insurer that intentionally delayed and hampered the payment of an employee's claim to force settlement at a discount violated Section 176.82); ***Jones v. Liberty Mut. Ins. Co.***, 474 N.W.2d 18, 19 (Minn. App. 1991) (finding that an over-two-year delay in paying wage and medical benefits was a violation of Section 176.82). The *Bergeson* court wrote that "this civil action is intended to cover those situations where the insurer's delay or denial of benefits goes beyond unreasonableness, neglect, or obstinance." *Bergeson*, 414 N.W.2d at 727. The conduct must be proven by clear and convincing evidence. ***Id.*** at 727-28. In deciding whether a factual dispute is material, a court must consider this evidentiary standard. ***Anderson***, 477 U.S. at 254-55.

A.

Viewing the facts most favorably to Nunn, there are genuine issues of material fact whether Noodles intentionally obstructed her receipt of workers' compensation benefits through Gibson's fabrications and its 17-month delay in payment.

According to the evidence, Gibson had an unworthy motive to lie about the purpose of the meeting with Nunn because he faced punishment for holding mandatory meetings off-site and off-the-clock. The ALJ, who judged credibility, determined he was not credible. Noodles argues that, even if he intended to lie, Gibson did not intend to obstruct Nunn's benefits. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. The district court improperly weighed the ALJ's determination that Gibson was not credible against its own view that "Nunn's deposition testimony was not entirely credible either, and it is entirely possible that she was embellishing." Viewed most favorably to Nunn, Gibson desired to cause the probable consequence of his statements: the obstruction of Nunn's benefits. The same analysis applies to Mako's changed testimony about the meeting. *See* *Kaluza*, 403 N.W.2d at 233 ("The question, then, is whether [the] alleged conduct constitutes intentional obstruction. The Restatement (Second) of Torts uses the word 'intent' 'to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.'" (citation omitted)). In sum, there are genuine issues of material fact whether Noodles, through Gibson and Mako, knowingly offered false testimony in support of a baseless defense.[2]

---

[2] In addition to the necessity of compensatory damages, Minnesota has specific requirements for assessing punitive damages under Section 176.82. **Minn. Stat. § 549.20.** This court need not address vicarious liability for punitive damages, which are speculative at this point. *See* *Jones*, 474 N.W.2d at 19 ("Actions under [Minn. Stat. § 176.82] are reserved for extremely outrageous conduct. Nonetheless, nothing in the language of the statute requires that punitive damages be awarded in every case. Rather, the punitive damage award is permissive, subject to the judgment of the fact finder." (citation omitted)).

Similarly, there are genuine issues of material fact whether the delay was an intentional obstruction of benefits. Because Zurich and Noodles shared counsel at trial, Nunn argues that Noodles should be responsible for the trial strategy. Noodles blames Zurich for any misconduct, emphasizing that the insurance policy required Zurich to investigate any workers' compensation claims and afforded Zurich the absolute right and discretion to accept, deny, litigate, or settle all claims. In November 2007, after the depositions of Gibson and Mako, Noodles inquired of Zurich about accepting liability, due to concerns about the prospect of trial and its representation. According to Noodles, it did not believe the case should go to trial and asked Zurich to accept liability for Nunn's claim nearly a year before trial. Noodles claims that Zurich declined its request to accept liability, again citing the open-ended, long-term medical costs. Noodles asserts it would have exhausted its $100,000 deductible — which it had already set aside — regardless of whether it settled or went to trial, so it had no financial stake in a trial outcome. Nunn disagrees, noting that Noodles would be subject to increased premiums if the claim were paid in full. At any rate, Zurich disputes Noodles' version of the events, contending that Noodles wanted a more aggressive trial strategy. Noodles and Zurich have demonstrated a genuine issue of material fact whether Noodles, through delay, intended to obstruct Nunn's benefits.

B.

Viewing the facts most favorably to Nunn, genuine issues of material fact remain whether Zurich intentionally obstructed her receipt of workers' compensation benefits by concealing Gibson's first statement about the purposes of the meeting, filing a factually-inaccurate claim denial, and continuing to deny the claim through trial.

Draves-Blandin testified that she discussed with attorney Grove the existence of Gibson's recorded statement admitting the (primarily) business purpose of the meeting. But, Zurich did not disclose this statement until discovery in the present case, despite multiple opportunities to do so. The district court believed that it was "unlikely that the failure to produce the [first Gibson] statement was intentional, because the statement is largely redundant evidence that the meeting had a mixed purpose." Though Gibson does eventually say that the purpose of the meeting was "work plus additional things," this is hardly redundant. First, the statement has independent value as the initial statement Gibson gave Zurich and the only first-person statement it had at the time of claim denial. Second, Gibson talks mostly about work purposes for the meeting, which was the central issue in the workers' compensation case. Third, as to off-site meetings, this statement contradicts Gibson's other statements and Zurich's denial.

The district court hypothesized that if the first statement were revealed, it may have actually helped Gibson's credibility because he did not lie to Zurich the first time he was interviewed. To the contrary, one can reasonably infer from the concealed statement that Gibson — seeking to avoid punishment — told Zurich the truth privately but did otherwise in situations where the information seemed readily available to his employer. Zurich asserts that the Gibson statement would not have affected attorney Grove's opinion about proceeding with the case — but this statement is still valuable to the ALJ and Nunn. Additionally, the testimony of Zurich's representatives varies about why they did not produce Gibson's statement earlier. Though the district court noted that the ALJ did not sanction defendants, this is irrelevant because the first Gibson statement was not revealed to the ALJ. Nunn is entitled to the reasonable inference that Zurich intentionally concealed the first Gibson statement.

Draves-Blandin prepared and filed a claim denial, which apparently included facts she knew were false, such as that *all* Noodles business meetings occur on-site with employees clocked in. That there were no off-site business meetings was contradicted by Gibson's recorded statement. The denial's characterization of the function as a "party" had little foundation. Given the very short time between her gathering of the information and her denial of the claim, the reasonable inference in favor of Nunn is that Draves-Blandin's omissions and inaccuracies were deliberate. Even after sworn depositions of Gibson and Mako demonstrated the (predominately) business nature of the meeting, Zurich continued to deny Nunn's claim.

Nunn's expert has practiced workers' compensation defense since 1981. Having reviewed the depositions of Gibson and Mako in the workers' compensation case, the expert concluded that there was no evidence that Nunn was not injured in the course and scope of her employment.

> Whatever the reason that Mr. Gibson's statement was not disclosed until this action, it is now established that Zurich had the statement when it served and filed the primary denial of liability. This, in addition to conduct by Zurich's counsel through the end of the workers' compensation trial, and the entire course of conduct by Zurich and Noodles, is consistent with the deliberate attempt to keep the key liability fact from the administrative law judge. I am unaware of any facts in this matter, Minn. Stat. §176 *et seq.*, or the case law interpreting that statute, that provide a good faith basis to have denied Ms. Nunn's claim in June, 2007. Compounding this egregious conduct are athe [sic] opportunities Zurich had to correct the matter; instead it chose to litigate a meritless defense.

Zurich argues that without a complete obstruction of benefits, the statute does not apply. To the contrary, a substantial delay for an unworthy motive can violate the statute. *Kaluza*, 403 N.W.2d at 234 ("To obstruct something is . . . to make accomplishment of the desired end difficult and slow.") The cases Zurich offers are inapposite. *See, e.g.*, *Flaherty v. Lindsay*, 467 N.W.2d 30, 32-33 (Minn. 1991) (holding "some actual denial *or disruption* in the receipt of benefits must occur to warrant recovery" (emphasis added)); *Summers v. R&D Agency*, 593 N.W.2d 241, 244 (Minn. App. 1999) (finding no prejudice to claimant when he had started working again at the time of the unjustified discontinuance of benefits).

Zurich also contends that it was entitled to defend a claim that it had a slim chance of defeating. The issue here is how that defense was conducted, including the concealment of the Gibson statement, the factually-inaccurate denial of the claim, and the substantial delay in payment. Zurich's internal communications justify a reasonable inference that Zurich resisted the claim due to its expense — an unworthy motive. *See Bergeson*, 414 N.W.2d at 728. In particular, an e-mail from a Customer Service Account Executive shows that Zurich believed that Noodles might take its business elsewhere without a favorable resolution to Nunn's case. There are genuine issues of material fact whether this conduct was outrageous and extreme, or egregiously cruel or venal.

Zurich admits it delayed payment of Nunn's claim, but denies it did so in an outrageous and extreme, or egregiously cruel or venal manner. Zurich attempts to distinguish the *Kaluza* case on the basis that the insurer there repeatedly changed the rationale for nonpayment. In fact, the court in *Kaluza* emphasized that the insurer's intentional delay was designed to force the claimant to settle his claims for a discount, which was sufficient to violate Section 176.82. *Kaluza*, 403 N.W.2d at 233-34. There is a genuine issue of material fact whether Zurich's strategy was aimed at the same goal. Also, the *Jones* case held that an over-two-year delay in paying wage and medical benefits was a violation of Section 176.82. *Jones*, 474 N.W.2d at 19. In this

case, 17 months passed between Nunn's injury and the trial that awarded her benefits.[3]

The district court noted that an unfounded refusal to pay compensation may violate Section 176.82, citing *Kaluza*. The court, however, seemed to believe that a meeting of "mixed purposes" justified denying Nunn's claim: "Under these facts, a jury could not conclude that the meeting's purpose was black as opposed to white or that Defendants 'knew' that it was so work related that Nunn's claim was undeniably compensable." In reality, if Noodles and Zurich knew that the meeting was primarily work-related, they had no basis to deny the claim. The dual purpose doctrine establishes that Nunn's injury would be compensable regardless of whether social conversation was planned or expected because Gibson scheduled the meeting to discuss business. As the ALJ concluded: "The employee's work necessitated the trip and the trip would have been made even if no personal purpose had existed."

Given the totality of the evidence, genuine issues of material fact remain for trial under the clear and convincing standard.

*******

The judgment of the district court is reversed, and the case remanded for further proceedings consistent with this opinion.

---

[3]Zurich relies heavily on *Furrer v. Campbell's Soup Co.*, 403 N.W.2d 658 (Minn. App. 1987). In that case, the employee sued under a different clause of the workers' compensation law, which prohibits retaliation against employees who seek workers' compensation benefits. *Id.* at 660. The clause at issue here does not require "threats or coercion" to be actionable.