Sally CISZEWSKI, Judy Lucking,
Laura Carlson, Kathryn Niesen
and Faye Kopp, Plaintiffs,

v.

ENGINEERED POLYMERS CORP.,
d/b/a/ Cookson Plastic Molding Corp.
and EPC Loudon, Defendant.

Civ. No. 99–1666 (JRT/RLE).

United States District Court,
D. Minnesota.

Sept. 30, 2001.

---

Clair E. Schaff, Patrick M. Connor, and Eric D. Satre, Conner, Satre & Schaff, L.L.P., Minneapolis, MN, for Plaintiffs.

Andrew J. Voss and Kathryn Mrkonich–Wilson, Littler Mendelson, P.C., Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER

TUNHEIM, District Judge.

Plaintiffs Sally Ciszewski ("Ciszewski"), Judy Lucking ("Lucking"), Laura Carlson ("Carlson"), Kathryn Niesen ("Niesen") and Faye Kopp ("Kopp") bring this action against defendant alleging claims of disability discrimination, workers compensation retaliation and gender discrimination. The defendant has moved for summary judgment on all claims. For the reasons that follow, the Court grants defendant's motions on plaintiffs' disability discrimination, retaliatory discharge and disparate treatment gender discrimination claims. The Court also grants defendant's motions as to Lucking and Kopp's hostile work environment claim, but denies defendant's motions as to Ciszewski, Carlson and Niesen's hostile work environment claim.

## BACKGROUND

### I. Cookson's Manufacturing Plant

The Cookson Plastic Molding Corporation ("Cookson") manufactures a variety of custom molded plastic products. There are between 475 and 550 people currently working at the Mora, Minnesota plant, with the majority of them working as either press operators or in finishing or painting positions.

The plant's press operation is divided into three separate rooms, known as the 100 Room, the 200 Room, and the 300 Room. Presses in the 200 and 300 Rooms require the ability to lift parts weighing up to 65 pounds while presses in the 100 Room, which handle smaller parts with shorter run times, require manual dexterity and the ability to clip more parts. Production demands can require Cookson to move press operators initially assigned in the 100 Room to presses in the 200 or 300 Rooms.

Cookson is a custom manufacturing shop whose production schedule is driven entirely by its customers' demands. Much of Cookson's repeat business consists of large, heavy parts such as pallets or plastic doors. Although hundreds of different smaller products are produced in the 100 Room, Cookson cannot designate certain presses solely for production of smaller parts or otherwise provide a steady stream of work on smaller parts.

### A. The Press Operator Position

The majority of Cookson's employees are press operators. The job duties of a press operator include removing parts from the press, closing the door, trimming and cutting off excess material, inspecting the part to ISO standards and customer requirements, doing auxiliary add-value work, if needed, and packaging the completed product. Cookson's formal job description for the press operator position requires, among other things, that an individual be capable of lifting heavy parts for the larger presses and have good hand and eye coordination. Throughout the plant, the lifting requirements range from 2 to 65 pounds, with the parts manufactured in the 100 Room being as low as 2 to 3 pounds.

## II. The Individual Plaintiffs

### A. Sally Ciszewski

Ciszewski began working at Cookson in May 1998 as a press operator in the 100 Room. Consistent with the job description noted above, Ciszewski's job duties included removing parts from the press, either clipping or trimming excess material, installing inserts, drilling, sonic welding, and hammering. Most parts needed to be clipped.

When Ciszewski was hired, Cookson knew that she had shoulder and back problems and restrictions. She informed Cookson that she had a ten-pound lifting restriction and no overhead reaching. She also has a 10.5 percent permanent partial disability relating to a prior disc injury. Ciszewski was supervised by Rollin Nelson ("Nelson"), who also recommended that Cookson hire her for the position.

In July 1998, shortly after beginning work at Cookson, Ciszewski visited her physician about lumps in her wrist. She subsequently filed a workers' compensation claim based upon this injury, which was eventually approved. By November 1998, Ciszewski's pain had worsened, and she was restricted to limited use of her arms to avoid repetitive flexing and extension of her wrists. A November 11, 1998 Work Status Report states that "[Ciszewski] does repetitive movements with her wrists and lots of gripping" as part of her press operator duties. The report restricted Ciszewski to "light right and left hand work."

As a result of her injury, Ciszewski was placed on light duty. Nelson attempted to find work within Ciszewski's restrictions and frequently had other employees switch presses with her, but Ciszewski alleges that Nelson often gave her assignments outside her restrictions. Ciszewski saw her doctor again on November 25, 1998. In his report, the doctor noted that "she tried some lighter duty at work, but apparently she still does a lot of grasping on an almost continual basis." Her doctor imposed additional restrictions to avoid any repetitive grasping.[1]

By December 1998, Ciszewski's pain had worsened and Ciszewski complained to Cookson's Human Resources Manager, Karleen Crocker ("Crocker"), that Nelson was giving her work outside of her restrictions. Crocker met with Nelson and Ciszewski to discuss the situation and they agreed that Ciszewski would perform grinding work for the next two weeks.

Ciszewski's restrictions continued through March 1999. A March 1, 1999 Work Status Report restricted her to "light right hand work and no more than forty hours per week." She claims that her condition worsened by continually being placed outside her restrictions. At that time, Ciszewski states she was working on all the presses in the 100 Room except for two, and also worked in the 200 Room. She states that there were several jobs that had light right work that she could have performed within her restrictions, including: fridge strips, retainer bars and wheels. By May 1999, "everything" Ciszewski did with her arm caused her pain and discomfort.

According to Cookson, economic pressures in the Spring of 1999 forced it to restructure its workforce. Specifically, Cookson sought to increase the efficiency

---

1. Dr. Johnson made the following notation: "I gave her a note stating that she should not do repetitive grasping over five times an hour for two weeks. I also wonder about long term whether or not she would be better off looking for different employment, as this started shortly after her employment there, and grasping is an integral part of all the jobs in that corporation."

of its direct labor and decrease the use of indirect labor, i.e., non-production positions. To accomplish this restructuring, Cookson combined positions, eliminated certain indirect labor jobs and reassigned those duties, eliminated some of its twelve hour shifts and distributed employees evenly among all shifts. Cookson also combined jobs so that one operator could run two presses simultaneously. Additionally, it improved the tooling of its presses to substantially decrease the amount of auxiliary work, such as trimming, inserting and scaling.

The restructuring also forced Cookson to address its original philosophy of providing what it calls "makeshift" work to employees, which directly affected persons with work restrictions such as Ciszewski. In addressing this situation, Cookson's Vice–President of Operations. Gary Whitcher ("Whitcher"), decided that Cookson could no longer provide what had become "makeshift" work to those employees. Crocker and Linda Poe ("Poe"), the Plant Manager, met with Dave Samuel, Cookson's workers' compensation manager,[2] to discuss the employees currently on medical restrictions. Poe learned from Nelson that Ciszewski was not running presses regularly, and that he was forced to find and make work for her.

Poe and Nelson also had an individual meeting with Ciszewski and explained that Cookson could no longer accommodate her restrictions and that she would be placed on leave and receive workers' compensation for lost wages until her condition improved.[3] This was confirmed on April 22, 1999, by memorandum:

As previously communicated to you, due to our restructuring, we will not be able to accommodate your work restrictions at this time. WCMC will continue to monitor your medical progress and will contact us when your physical abilities increase. At that time we will review what job opportunities exist for you.

Ciszewski asked Crocker about this letter and Crocker explained that Ciszewski had not been operating presses on a consistent basis. Ciszewski also alleges that Nelson told her that she needed to be "100 percent" before she returned to work. By early May, Ciszewski's pain had worsened. Her last day at the plant was May 4, 1999.

Ciszewski's medical restrictions continued after Cookson placed her on leave. On June 4, 1999, Ciszewski was referred to a Qualified Rehabilitation Counselor (QRC). Ciszewski agreed with her QRC's recommendation to postpone a job search until her restrictions allowed some use of her right arm.

Ciszewski's symptoms remained unchanged through September 1999. On October 13, 1999, Crocker sent Ciszewski a letter stating:

Due to restructuring in May 1999, we were no longer able to accommodate your medical restrictions. However, you still remain an employee of Cookson Plastic Molding.

Have your medical restrictions changed since May 1999? Are there any jobs at Cookson Plastic Molding which you feel you can perform at this time? Please provide a current and detailed medical statement outlining your restrictions and a list of jobs you feel you can perform . . . .

---

**2.** Cookson hired Samuel's company, Workers Compensation Modifier Controllers ("WCMC"), in August or September 1998 to manage Cookson's workers' compensation claims.

**3.** Ciszewski admits that she has never been denied any request for workers' compensation benefits since her initial claim was approved.

Ciszewski did not respond to this letter. Instead, her attorney drafted a letter for her signature threatening litigation.

Ciszewski's doctor observed no improvement in Ciszewski's pain symptoms in October 1999, and he did not release her to work. Ciszewski's QRC continued to postpone any job search pending a change in her condition. As of November 24, 1999, Ciszewski was once again completely restricted from working, and these restrictions continued through January 2000.

On January 5, 2000. Ciszewski had surgery on her right arm, but her symptoms only worsened. She was released to work with only one hand on January 19, 2000. This one-hand restriction continued through April 2000; on May 24, 2000, she was restricted from performing any work once again. Ciszewski's QRC continued to communicate with WCMC regarding Ciszewski's medical condition during this period.

### B. Judy Lucking

Judy Lucking worked at Cookson for 23 years, initially being hired as a press operator. Lucking progressed through various positions, including several years as a foreman/supervisor. For the last two and one-half years, she worked as a fixture room technician. Her duties included cataloging, maintaining, supplying and setting up manufacturing fixtures for the three production rooms, setting up small hand equipment, such as drills, sanders, and welders and ordering supplies. Lucking was supervised by Bruce Nehring ("Nehring").

In January 1998, Lucking injured her left shoulder while moving fixtures, and she immediately completed an accident report. Lucking was subsequently placed on medical restrictions to avoid any lifting over shoulder height, which continued for the next eight months. A July 8, 1998 Work Status Report indicated no lifting above the shoulder. She asked management for a hydraulic table to help her perform her job. Although Cookson could not find such a table, they did provide her with a table with a larger handle that was easier to operate. By September 1998, Lucking's symptoms had not improved. In a September 9, 1998 Work Status Report, Lucking's doctor diagnosed her with shoulder instability and restricted her from lifting anything over 5 pounds with her left upper arm. In December 1998, an MRI detected a labral tear of the shoulder. Lucking underwent surgery on January, 25, 1999, after which she was restricted from any work for three weeks and was restricted from using her left upper arm for six weeks.

By mid-April 1999, Lucking returned to the plant, working three hours per day with limited duty in her left upper arm; her schedule gradually increased to eight hours a day. Lucking could not return to the fixture room technician position because her work restrictions prevented her from performing the lifting, moving or repairing duties of the position. Instead, Nehring assigned Lucking other tasks, such as, updating the black books, cleaning and re-stocking the first aid cabinet, checking to see if supplies had been ordered, remarking fixtures, cleaning and re-organizing work areas, and working on new fixtures.

In April 1999, Lucking's position as a fixture room technician was eliminated as part of Cookson's restructuring. Poe held a meeting with the entire first shift to explain the restructuring, which plaintiff attended. At this meeting plaintiff alleges that Poe announced that people who were on light duty or who worked on a less than a hundred percent basis would probably no longer be employed with Cookson.

Poe and Nehring also had an individual meeting with Lucking to explain to her that her position was being eliminated. Lucking alleges that when she asked Poe what her options were, Poe told her she had none. Poe then advised Lucking that she would be placed on leave and receive workers' compensation for lost wages until her condition improved and she could perform an available job. This was confirmed in an April 22, 1999 memorandum:

> As previously communicated to you, due to our restructuring, we will not be able to accommodate your work restrictions at this time. WCMC will continue to monitor your medical progress and will contact us when your physical abilities increase. At that time we will review what job opportunities exist for you.

Lucking began receiving benefits immediately upon being placed on leave on May 7, 1999 and has never been denied any request for workers' compensation benefits since her initial claim was approved.

After being placed on leave, Lucking continued working with her physical therapist on a weekly basis. By May 18, 1999, she was working with her husband at the family's bar and grill, tending bar and serving food, but unable to do certain things above her shoulder such as stocking the cooler or cleaning the hood. In June 1999, WCMC assigned Lucking a Qualified Rehabilitation Counselor (QRC) to assist in her rehabilitation and return to work.

As of August 17, 1999, Lucking continued to experience ongoing problems; she remained on restrictions to avoid any use of her left arm and any heavy lifting or active work with either arm. On September 2, 1999, Lucking's doctor restricted her from performing any work in anticipation of major shoulder stabilization surgery. On October 13, 1999, Cookson contacted Lucking in a letter stating:

> Due to restructuring in May 1999, we were no longer able to accommodate your medical restrictions. However, you still remain an employee of Cookson Plastic Molding.
>
> Have your medical restrictions changed since May 1999? Are there any jobs at Cookson Plastic Molding which you feel you can perform at this time? Please provide a current and detailed medical statement outlining your restrictions and a list of jobs you feel you can perform to WCMC . . .

Like Ciszewski, Lucking did not respond to this letter. Instead, her attorney drafted a letter for her signature which threatened litigation. As of November 16, 1999, Lucking was still on restrictions not permitting any work, although she continued to work at her family's tavern three days a week. On December 9, 1999, Lucking's physician released her to return to work with restrictions on her left shoulder to avoid lifting over ten pounds, any activity above the shoulder, and any repetitive outstretched reaching more than four to six inches away from her body.

On January 6, 2000, Crocker offered Lucking a press operator position in the 100 Room. This position required lifting no more than three pounds, welding, and inserting metal pieces, and trimming. On January 20, 2000, Lucking and her QRC conducted a job analysis, but determined that this position did not meet Lucking's medical restrictions. Lucking thus declined Cookson's offer to return to the plant.

Lucking underwent a second surgery on February 18, 2000. Following surgery, Lucking's doctor concluded that she would never be able to perform repetitive work over shoulder height or out away from her body. By August 29, 2000, Lucking had found alternative employment as a hostess at a local casino.

## C. Laura Carlson

Carlson began working at Cookson on August 5, 1996, as a press operator. Her supervisors in this position were Dave Walberg and Rollin Nelson.[4] In the spring of 1998, Carlson also became a "coordinator" for the 100 Room, which required her to check to see what presses were running and assign operators to those presses.

In September 1996, Carlson reported that she had injured her elbow on the job, and she filed a claim for workers' compensation benefits. Carlson's doctor provided her with a splint and restricted her to lighter duty. On October 30, 1996, Carlson's doctor further restricted her to lifting no more than ten pounds with her right arm.

In an attempt to accommodate Carlson's restrictions, Cookson placed her on smaller presses, however, Carlson stated the work still required her to do a lot of pushing and pulling which aggravated her right arm. By November 7, 1996, Carlson's condition had worsened; she was placed on a two-week restriction to avoid hyperextension of her elbow or frequent pushing or pulling.

Carlson's restrictions were continued following a visit to her doctor on December 4, 1996. By February 20, 1997, Carlson was still restricted from hyperextending her arm, and by March 11, 1997, Carlson's restrictions prevented any lifting over five pounds and any trimming more than two hours per shift. At her March 11 appointment, Carlson's doctor suggested to Carlson that her job at Cookson may not be appropriate, given her injury, and that she should consider looking for other work that fit within her limitations. Carlson's light-duty restrictions continued through August 25, 1997 and by October 30, 1997, Carlson was further restricted from repetitive use of her arms, any lifting over five pounds, and any use of her left arm for three weeks.

By February 1998 Carlson reached maximum medical improvement with respect to her work-related injury and she was released to work without restrictions.[5] However, by April, Carlson's symptoms recurred and she was restricted from repetitive or forceful use of her arms and hands for one month. On September 30, 1998, the restriction was changed to "limit use of right arm to 4 pounds."[6] Carlson elected to have tennis elbow release surgery on December 17, 1998; after that, Carlson was even more restricted with respect to her ability to work at Cookson. She returned to work on December 28, 1998, but could not use her right arm until January 19, 1999, and even then only for light-duty. These light-duty restrictions continued through April 14, 1999.[7] During this time, Carlson was working "very little" on presses and was mainly packing parts, wiping down presses, or sweeping floors. She admits that she was not able to perform many tasks during this time, and in fact, she could only operate certain

---

4. Nelson also recommended that Cookson hire Carlson during the interviewing process.

5. Sometime in early November 1997, Carlson broke her ankle in a non-work related incident. She underwent surgery and was out of work for six weeks. When Carlson returned, she could not stand so Cookson provided her with seated duties as a second operator on a press.

6. In June 1998, Carlson left work for six weeks for non-work related surgery.

7. During her doctor's visit on April 14, 1999, Carlson's doctor again recommended that she look for a job that did not require repetitive work.

presses in the 100 Room, depending on the product.

During Cookson's restructuring, Poe learned from Nelson (Carlson's supervisor) that she was not running presses regularly, and that he was forced to make work to keep her busy. In the spring of 1999, Poe and Whitcher held an informational meeting with plant employees to explain the workforce restructuring. Poe informed employees that sales were down from customer forecasts.

On April 23, 1999, Poe and Nelson met with Carlson individually and explained that Cookson was restructuring its workforce and could no longer accommodate her restrictions, and that she would be placed on workers' compensation leave with lost wage benefits until her condition improved. This was confirmed by memorandum:

> As previously communicated to you, due to our restructuring, we will not be able to accommodate your work restrictions at this time. WCMC will continue to monitor your medical progress and will contact us when your physical abilities increase. At that time we will review what job opportunities exist for you.

On May 3, 1999, Carlson met with a Qualified Rehabilitation Consultant (QRC), assigned by Cookson's workers' compensation carrier, and discussed her interest in pursuing a Class A license for construction work. From May 7, 1999 forward, Carlson received workers' compensation benefits while her QRC worked with a placement service to assist Carlson in finding alternative employment. During this time, Carlson's QRC and doctor instructed her to avoid repetitive upper extremity motion and frequent extension of the elbows, prolonged grasping and flexed gripping, and any lifting over five pounds with her right arm.

On or around September 7, 1999, Carlson began work as a truck driver for Jones Construction, which requires her to drive a stick shift and to work ten to twelve hours per day. Although she is working, Carlson states that there are things she cannot do in her new job such as shoveling or carrying the heavier pipe.

## D. Kathryn Niesen

Niesen began working at Cookson in July 1997 as a press operator. Niesen was supervised on the weekend shifts by Kayla Roberts ("Roberts"); she would occasionally pick up weekday shifts under the supervision of Bruce Nehring or Geoff Wiener. Niesen resigned her employment at Cookson in the Summer of 1998 intending to enter college. Instead, Niesen applied and was accepted at the Minnesota Medical Institute ("MMI") in Bloomington, Minnesota.

Niesen returned to Cookson in November 1998. On February 7, 1999, Niesen noticed that her wrists hurt while she was operating a press, and she advised Roberts that she could not operate the press without assistance. Roberts gave her a wrist brace; and later reassigned her to a press with smaller parts in the 100 Room. Niesen subsequently filed a claim for workers' compensation benefits.

On February 11, 1999, Niesen was placed on restrictions to avoid any lifting over five pounds, clipping, vibrations, and constant repetitive motion. Performing the duties required of a press operator i.e., removing, trimming, and packing the parts, exacerbated Niesen's injury. During the time that Niesen's wrists hurt, Roberts tried to find work for her, either in the office or redoing plant procedure manuals.

At her deposition, Niesen testified that while she was injured, she could still work on certain presses as the second or third

operator responsible for packing, but in a journal that she kept, Niesen complains that these very same jobs caused her pain. For example, Niesen contends that she could work on the press manufacturing "Hil Rom" parts, even though she complained on March 28, 1999, that she lost feeling in her hand while working on this press. She also testified that she could run the press that made refrigerator strips, yet she wrote on April 10, 1999 that this job hurt her wrists. Finally, although Niesen testified that she could package parts, she complained in her journal that packing hurt her wrists.

On April 2, 1999, Niesen's physician placed her on additional restrictions to avoid any repetitive motion with either hand, any clipping, and any exposure to vibrations. When Niesen did not appear for her next scheduled shift, Roberts issued her a warning for absenteeism. The following week, Niesen's doctor restricted her from any work for seven days. Niesen wrote a note to Crocker, enclosing these restrictions, and left the note with Cookson's receptionist. In this note, Niesen indicated that if Cookson could not meet these restrictions, Cookson should communicate with Payroll Concepts' workers' compensation manager, who would process Niesen's wage workers' compensation claim. Crocker explained that Cookson could not accommodate Niesen's current restrictions. Niesen began receiving wage loss benefits from Payroll Concepts' workers' compensation insurer the first week after she left the plant. When Niesen stopped reporting to work, Roberts issued a termination notice of Niesen's assignment at Cookson.

By April 30, 1999, Niesen was still experiencing pain and numbness in her shoulder even though she was no longer working. Niesen met with a qualified rehabilitation counselor (QRC) assigned by her workers' compensation insurer on May 25, 1999 to discuss a rehabilitation plan. Niesen's QRC did not initiate a job search at that time because she could not find any jobs that could accommodate Niesen's work restrictions.[8] By July 7, 1999, Niesen was still restricted to only minimal work with either hand and no repetitive use, which continued through August 25, 1999. According to Niesen's QRC, these restrictions still could not be accommodated.

In September 1999. Niesen's QRC initiated placement services to find alternative employment for Niesen. Niesen focused her job search on obtaining experience in a veterinary clinic. In October 1999, Niesen enrolled at MMI in Bloomington, Minnesota to obtain her veterinary technician certificate. She accepted a position as a veterinary technician at the Cambridge Veterinary Clinic on December 21, 1999.

### E. Faye Kopp

Kopp began working at Cookson in 1979 as a press operator and remained in that position the entire time she worked at the plant. On March 18, 1997, Kopp injured her thumb on the job. She filed for workers' compensation and began working with restrictions that allowed only light work with her left-hand and prohibited any left-hand lifting or repetitive motion.[9] In connection with Kopp's

---

**8.** Niesen's restrictions at this time prohibited any exposure to vibrations, any clipping, and anything more than limited repetitive motion. These restrictions continued through June 29, 1999. Niesen did not communicate these restrictions to anyone besides her QRC, who was retained by Payroll Concepts.

**9.** Nehring attempted to accommodate Kopp's restrictions by placing her on full automatic presses or presses for smaller parts. Howev-

application for benefits, Cookson's workers' compensation insurer provided her with a Qualified Rehabilitation Counselor (QRC) to assist in locating other positions at the plant that fit within Kopp's medical restrictions.

On October 8, 1997, Kopp had surgery on her thumb. In November 1997, Kopp told her QRC. John Witzke, that she did not believe she could return to work as a press operator due to her injury. In fact, Kopp did not believe she could perform any of the available positions at Cookson because they all required the use of both hands. On February 9, 1998, Kopp returned to work with a restriction of only light duty work with no lifting over seven pounds.

On June 17, 1998, Kopp injured her back at work and she filed a second workers' compensation claim and left the plant. Kopp remained off work through July 29, 1998. On August 7, 1998. Kopp's doctor released her to return to work for eight hours per day with no lifting of more than seven pounds. Kopp continued working under these restrictions through October 1, 1998; she performed some inspecting work and some "odd jobs," such as filing in the office.

By December 1998. Kopp was restricted to the following jobs within a two-pound lifting limit: grinding, sorting, bagging and wiping off parts, and constructing boxes no more than 18 inches per side. During this time, supervisor Nehring communicated extensively with Kopp's QRC to identify continuous work within Kopp's restrictions. As of January 1999, however. Kopp was still working within a light-duty, two-pound lifting restriction.

On February 24, 1999, Nehring informed Kopp's QRC, Witzke, that Kopp's restrictions were becoming increasingly difficult to accommodate; Kopp could only work on presses with automatic doors, and the plant did not have sufficient grinding work to keep her occupied when those presses were not running. Kopp and Witzke met with Nehring and Crocker to discuss Kopp's medical restrictions. Nehring explained that Cookson was having difficulty finding work within Kopp's restrictions. As of March 5, 1999 Nehring and Crocker understood that Kopp would continue to work on presses that were within her restrictions and would inform her supervisors of any difficulties. Throughout this time period, Crocker also worked with Poe and Nehring to identify existing jobs that Kopp could perform.

By March 1999, Kopp's hand condition had worsened and her doctor restricted her to six weeks of only paperwork, answering phones, or working on a keyboard, with no lifting using her left hand. Kopp's doctor also recommended avoiding any tasks that required much ripping, manipulation or lifting. In response, Nehring found temporary office work for Kopp to perform within these restrictions. Meanwhile, Kopp's QRC continued to work with her supervisor to identify continuous work for Kopp. On March 25, 1999, a Health Care Provider Report indicated a diagnosis of a "Degeneration of Lumbar Spine."

Kopp's severe restrictions continued in April 1999. By May 1999, Kopp could not perform any lifting, grasping or manipulation of parts. Although Kopp was occasionally operating a few of the presses in the 100 Room (when only the smallest parts were running), those particular

---

er, these presses did not run on a consistent schedule, so Nehring gave Kopp other work, that is, tasks that were ordinarily performed by the press operators during their shifts, such as grinding, rework, sweeping, sorting, or inserting parts.

presses did not run consistently and did not provide continuous work.

Like the others, Kopp was informed in an individual meeting with Poe and Nehring that Cookson was restructuring its operations. Poe also explained that she had concluded that Kopp could not work at the plant as long as her condition prevented her from performing any of the available jobs. Kopp would be placed on leave and receive workers' compensation for lost wages until her condition improved. This was confirmed in May 1999, in a memorandum:

As previously communicated to you, due to our restructuring, we will not be able to accommodate your work restrictions at this time. WCMC will continue to monitor your medical progress and will contact us when your physical abilities increase. At that time we will review what job opportunities exist for you.

Following her placement on leave, Kopp worked with her QRC to rehabilitate her hand and find alternative employment while remaining on workers' compensation leave. Kopp worked for two days at a motel as a desk clerk, but left that position because of pain in her left hand. On October 13, 1999, Crocker sent a letter to Kopp stating:

Due to restructuring in May 1999, we were no longer able to accommodate your medical restrictions. However, you still remain an employee of Cookson Plastic Molding.

Have your medical restrictions changed since May 1999? Are there any jobs at Cookson Plastic Molding which you feel you can perform at this time? Please provide a current and detailed medical statement outlining your restrictions and a list of jobs you feel you can perform to

. . . .

Like the others, rather than responding to Cookson's letter, Kopp sent a letter draft-

ed by her attorneys that threatened litigation against Cookson.

As of January 2000, Kopp was still restricted from performing any gripping or grasping with her left thumb. In February 2000, Kopp accepted employment washing dishes at Rob's, a bar and grill During March 2000, Kopp worked at the Grand Casino in Hinckley, Minnesota, answering phones. At the same time, in March 2000, in an attempt to return Kopp to the workplace, Cookson asked Kopp's QRC to consider whether Kopp could operate presses in a room that was known as the Anderson cell. Kopp and her QRC conducted a job analysis, and Kopp determined that she could not perform the position. Kopp's doctor also reported that this position was outside of her medical restrictions. Most recently, on April 11, 2000, Kopp began working at Innovative Micrographics, Inc., where she takes pictures of medical records for microfilm.

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate if the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *See Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir.1981).

Although the Eighth Circuit has stated that "summary judgment should seldom be granted in employment discrimination cases," *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994), "summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 616 (8th Cir.1997).

## II. Disability Discrimination Under the ADA

■ The American with Disabilities Act ("ADA") prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a).[10] To establish a claim under the ADA, a plaintiff must first establish that 1) he or she has a disability within the meaning of the ADA; 2) that he or she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and 3) that he or she has suffered adverse employment action because of his or her disability. *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112 (8th Cir. 1995); *Wheaton v. Ogden Newspapers, Inc.,* 66 F.Supp.2d 1053, 1059 (N.D.Iowa 1999).

If a plaintiff can establish these three elements of his or her prima facie case, then the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its actions. *Allen v. Interior Constr. Servs. Ltd.,* 214 F.3d 978, 981 (8th Cir.2000); *Helfter,* 115 F.3d at 615. Once such a reason is proffered, the burden shifts back to the plaintiff to show that the employer's stated reason is pretextual. *Id.* To ultimately prevail, the plaintiff must establish that the employer treated plaintiff adversely "because of" a disability.

Defendant argues that plaintiffs' ADA claim fails because they cannot establish any of the essential elements of their prima facie case. Specifically, plaintiffs are not disabled within the meaning of the ADA, they cannot perform the essential functions of the press operator position at Cookson; and plaintiffs did not suffer an adverse employment action when Cookson placed them on workers' compensation leave in the spring of 1999. Plaintiffs' claim also fails, Cookson argues, because they have not proffered sufficient evidence that Cookson's legitimate basis for its decision was a pretext for discrimination.[11]

**10.** Plaintiffs also allege disability discrimination under the Minnesota Human Rights Act ("MHRA"), Minn.Stat. §§ 363.01 *et seq.* Cookson argues that under *Karst v. F.C. Hayer Co. Inc.,* 447 N.W.2d 180, 186 (Minn.1989), this claim is flatly preempted because each plaintiff's disability discrimination claim is based on work injuries for which they have already filed and received workers' compensation benefits. Cookson is correct. In *Karst,* the Minnesota Supreme Court held that a plaintiff's disability discrimination claim under the MHRA is barred by the exclusive remedy provision of the Workers' Compensation Act, Minn.Stat. § 176.001–85. Plaintiffs' contention that *Karst* is somehow limited to failure-to-rehire cases is unpersuasive. Nowhere in *Karst* did the court limit its holding to rehiring claims. Moreover, other courts have readily applied the holding in *Karst* in termination and failure to accommodate

claims. *Braziel v. Loram Maintenance of Way, Inc.,* 943 F.Supp. 1083, 1102 n. 20 (D.Minn.1996). Accordingly, the Court dismisses plaintiffs' MHRA disability discrimination claim asserted in Count I of their complaint.

**11.** Also, by separate motion, defendant moves to strike plaintiffs' affidavits, or portions thereof, on the basis that these statements contradict prior, sworn deposition testimony. The Eighth Circuit has held that, except under certain narrow circumstances, a plaintiff opposing summary judgment cannot create a genuine issue of material fact by filing an affidavit with directly contrary statements. *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364–66 (8th Cir.1983); *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 402 (8th Cir.1995). The Court has

## A. Plaintiffs' Prima Facie Case

### 1. Disability Under the ADA

As previously stated to establish a prima facie case under the ADA, a plaintiff must first establish that 1) he or she has a disability within the meaning of the ADA; 2) that he or she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and 3) that he or she has suffered adverse employment action because of his or her disability.

"The presence or absence of a disability is a threshold question." *Helfter*, 115 F.3d at 616. Under the ADA, disability is broadly defined to include not only "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," but also covers persons who are "regarded as having such an impairment." 42 U.S.C. § 12102(2)(A) & (C). "Only a permanent or long-term condition will suffice." *Mellon v. Federal Express Corp.*, 239 F.3d 954, 957 (8th Cir.2001).

The Equal Employment Opportunity Commission ("EEOC") regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1997). This list is not exhaustive, and also includes "sitting, standing, lifting, reaching." *Id.* § 1630.2(i) app. An impairment is considered substantially limiting if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or it significantly restricts the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the average person in the general population. *Id.* § 1630.2(j)(1)(I-(ii). The following factors are considered in determining whether a person is substantially limited in a major life activity: 1) the nature and severity of the impairment; 2) its duration or anticipated duration; and 3) its long-term impact. *Id.* § 1630.2(j)(2)(i)-(iii).

The Court first considers whether plaintiffs are substantially limited in a major life activity other than working.[12] Plaintiffs contend that their individual impairments substantially limit them in the major life activity of lifting. The Eighth Circuit has previously held that "a general lifting restriction imposed by a physi-

compared the relevant portions of the deposition testimony with the affidavits and agrees with defendant that many of the statements plaintiffs make in their affidavits contradict their prior sworn deposition testimony. Plaintiffs' argument that the affidavits merely explain inconsistencies and elaborate further on incomplete deposition testimony is without merit. If plaintiffs believed additional explanation was necessary, they had ample opportunity to do so after their depositions were taken. *Camfield Tires*, 719 F.2d at 1365 ("Both affidavits were filed by Camfield expressly for the purpose of opposing summary judgment, a year after he gave his deposition testimony."). Moreover, plaintiffs do not explain any reason why their statements in the affidavits contradict the prior testimony, thus failing to raise any possibility that the discrepancies are caused by confusion or mistake.

*RSBI*, 49 F.3d at 401 (noting that affiants "did not explain why the statements contained in their affidavits were contrary to the prior depositions and other sworn testimony"). Accordingly, the Court grants defendant's motion to strike those portions of the affidavits which contradict plaintiffs' prior sworn testimony.

12. According to the EEOC Interpretive Guidance, courts should first consider whether an individual is substantially limited in a major life activity other than working. 29 C.F.R. app. § 1630.2(j)("If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered.").

cian, without more, is insufficient to constitute a disability within the meaning of the ADA." *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir.1997). In *Snow,* the court concluded that plaintiff failed to produce sufficient evidence to create a triable issue that her 25 pound lifting restriction was substantially limiting. *Id.* In *Wooten v. Farmland Foods,* 58 F.3d 382 (8th Cir.1995) the court concluded that a lifting restriction against moderately heavy lifting, "10 lbs. Frequently, 20 lbs. Maximum" was legally insufficient. *Id.* at 386. In *Helfter,* the court concluded that a similar lifting restriction was insufficient. 115 F.3d at 616–17.

Most recently, the Eighth Circuit revisited this issue in *Mellon v. Federal Express Corp.,* 239 F.3d 954 (8th Cir.2001) and concluded that plaintiff's disability claim which is based on the premise that "she cannot lift more than 15 pounds and should avoid other such stresses with her right arm" was insufficient as a matter of law to constitute a qualifying disability under the ADA. *Id.* at 957. The court reached this conclusion despite an affidavit by a Certified Rehabilitation Counselor who, in his opinion, believed that "plaintiff's wrist impairment represents a permanent disability which substantially impairs her major life activities of working, lifting, and caring for herself." *Id.* at 956.[13]

In this case, plaintiffs emphasize that they have had lifting restrictions at one time or another substantially more restrictive and at times were prohibited from any lifting at all with their injured hand, arm or shoulder. For the reasons that follow, the Court finds that only Ciszewski has

presented sufficient facts to create a triable issue as to whether she is disabled under the ADA.

#### a. Sally Ciszewski

■ Ciszewski's physical impairments include tendonitis in her right arm, chronic back pain and shoulder problems. Ciszewski has a ten pound lifting restriction and a 10.5 percent permanent partial disability as a result of chronic back pain, shoulder pain caused by a birth defect which inhibits her over-the-shoulder extension and tendonitis in her right arm which developed while working at Cookson. 29 C.F.R. app. § 1630.2(j) ("Multiple impairments that combine to substantially limit one or more of an individual's major life activities also constitute a disability."). Ciszewski's tendonitis, which started as a wrist injury, began in July 1998 and has continued since then. The lengthy duration of this impairment weighs in favor of a disability finding. 29 C.F.R. § 1630.2 app. (j) (explaining that "temporary, non-chronic impairments of short duration ... are usually not disabilities").

There is also evidence that the tendonitis in her right arm is quite severe. According to Ciszewski, "everything" she does with her right arm causes her pain. Ciszewski's diagnosis of Reflex Sympathetic Dystrophy ("RSD"), a responsive condition caused by the tendonitis which causes achiness and burning sensations, has aggravated her condition to the point where, at the time of her deposition in April 2000, Ciszewski could no longer straighten her arm or lift even a pan. The severity of Ciszewski's condition is further evidenced by an August 1999 report, in which her doctor stated that "[Ciszewski's] symptoms

---

**13.** The court also noted that plaintiff's "very general statements in [her] deposition about her personal activities are not supplemented elsewhere or detailed enough to allow a fact-finder to conclude that the alleged restrictions are so serious in nature as to constitute 'substantial' limitations." *Id.* at 957 n. 4.

are unchanged, making her right arm virtually useless."

### b. Judy Lucking, Laura Carlson, Kathryn Niesen and Faye Kopp

■ By contrast, although Lucking, Carlson, Niesen, and Kopp have demonstrated that their respective impairments affect their daily lives, they fall short of establishing that their impairments are substantially limiting. *Snow*, 128 F.3d at 1207 ("It is not enough that an impairment affect a major life activity; the plaintiff must proffer evidence from which a reasonable inference can be drawn that such activity is substantially or materially limited."). As of June 2001, Lucking's QRC listed Lucking's permanent restrictions due to her left shoulder impairment as "a maximum of 3 lb. above the shoulder, no repetitive use above the shoulder and no repetitive outstretched reaching with the elbow greater than 4–6 inches from the body."[14] While Lucking is correct that the weight restriction is substantially less than the plaintiff in *Mellon*, it is significant that the restriction applies only to above the shoulder use. Plaintiff does not have a 3 pound unconditional limit for all lifting. *Cf. Wheaton v. Ogden Newspapers, Inc.*, 66 F.Supp.2d 1053, 1062 (distinguishing between an unconditional 10 pound lifting restriction with a limitation of "10 pounds frequently and twenty pounds occasionally"). Furthermore, the restriction is concerned with the **repetitive** use of the shoulder, both above the shoulder and 4 to 6 inches away from the body, thus suggesting that some use is possible. (Emphasis

added.) Additionally, while Lucking must depend on her right arm to do certain personal activities such as driving, doing laundry or vacuuming, the Court does not believe these limitations are sufficient to allow a factfinder to conclude that Lucking's restrictions constitute "substantial" limitations. *Mellon*, 239 F.3d at 957 n. 4.

■ While Carlson's tennis elbow, Niesen's tendonitis, and Kopp's wrist injury may prevent them from doing repetitive motions, trimming, clipping or grasping, the precise motions necessary to perform the press operator position, it does not demonstrate that they are substantially limited in a major life activity other than working. *DePaoli v. Abbott Lab.*, 1996 WL 197685 *6, 1996 U.S. Dist. LEXIS 5284 at *20–21 (N.D.Ill. Apr. 22, 1996) (plaintiff's allegation that she could not perform repetitive motions with her right hand does not present genuine issue of material fact regarding her ability to perform a major life activity other than work).

■ The Court next considers whether Lucking, Carlson, Kopp or Niesen are substantially limited in the major life activity of working. A person is substantially limited in working if she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person with comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The factors to be considered include; the number and type of jobs from which the impaired individual is disqualified; the geo-

---

14. On June 28, 2001, plaintiff's counsel submitted a copy of Findings and Order from the Workers' Compensation Section of Minnesota's Office of Administrative Hearings denying Cookson's petition to discontinue Lucking's workers' compensation benefits. Unreviewed decisions of an administrative agency have no preclusive effect on the Court's determination of ADA claims, however. *University of Ten-*

*nessee v. Elliott*, 478 U.S. 788, 795–96, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (provision in Title VII indicated Congress' intent not to apply issue preclusion to findings of a state administrative body); *Pernice v. City of Chicago*, 237 F.3d 783, 787 (7th Cir.2001). Nonetheless, the Court accepts the evidence submitted by both parties.

graphical area to which the individual has reasonable access; and the individual's job training, experience, and expectations. *Helfter*, 115 F.3d at 617; 29 C.F.R. § 1630.2(j)(3)(ii).

Here, the four plaintiffs fail to create a genuine issue of fact as to whether they are substantially limited in the major life activity of working. To support their claim, plaintiffs rely almost exclusively on their medical restrictions to establish their disability. Courts, however, repeatedly grant summary judgment on ADA claims of disability where a plaintiff produces nothing more than their medical restrictions. *Helfter*, 115 F.3d at 615 (inability to perform sustained repetitive action with either hand and heavy lifting not enough to create triable issue that plaintiff is substantially limited in life activity of work); *McKay v. Toyota Motor Mfg.*, 110 F.3d 369, 372–73 (6th Cir.1997) (plaintiff's carpel tunnel syndrome, which restricted her from performing any "repetitive motion or frequent lifting of more than ten pounds" was insufficient to establish that the impairment disqualified her from a broad range of jobs); *Marinelli v. City of Erie*, 216 F.3d 354, 364 (3d Cir.2000) (plaintiff's ten pound lifting restriction not enough to demonstrate disability).

The only additional evidence some plaintiffs proffer are their own statements that the rural area in which they live and their limited education substantially limited their employment opportunities. These conclusory statements stand in contrast to the evidence put forth in *Fjellstad v. Pizza Hut of America*, 188 F.3d 944, 949 (8th Cir.1999) and *Mondzelewski v. Pathmark Stores Inc.*, 162 F.3d 778, 785–86 (3d Cir. 1998). In both cases, the plaintiffs provided testimony from occupational experts regarding the number of available jobs in the plaintiffs' market area and the jobs from which plaintiffs were precluded by their restrictions. In *Fjellstad*, for instance, the occupational specialist reported that of the 28,000 available jobs in South Dakota, plaintiff was eligible for only about 1,300 of these jobs due to her functional limitations. *Id.* at 949. This represented a 91 percent reduction in employability, and a 95 percent reduction in labor market access. *Id.*

Plaintiffs' claim is further weakened by the fact that all four plaintiffs have secured other employment since being placed on leave from Cookson. *Compare Gutridge v. Clure*, 153 F.3d 898, 901 (8th Cir.1998) (plaintiff failed to present evidence that he is substantially limited in major life activity of working in part because he had secured other employment) *with Fjellstad*, 188 F.3d at 948 (noting that plaintiff has been unable to secure other employment since her termination as factor in finding triable issue as to whether plaintiff is substantially limited in the major life activity of working). Shortly after being placed on leave in May 1999, Lucking worked at her family's tavern bar and later found employment as a hostess at a local casino. Carlson found work as a truck driver, which requires her to manipulate a stick shift and work twelve hours a day. Niesen accepted a position as a veterinary technician. Kopp found regular work answering phones at the Grand Casino in Hinckley, Minnesota, and now works at Innovative Micrographies, taking pictures of medical records for microfilm.

On this record, the Court finds that Lucking, Carlson, Niesen and Kopp have failed to present sufficient evidence that they are substantially limited in the major life activity of working. At most, plaintiffs' individual impairments and resulting work restrictions have left them unable to perform the sustained and highly repetitive duties of the press operator position. However, "the inability to perform a single, particular job does not constitute a

substantial limitation." 29 C.F.R. § 1630.2(j)(3)(i); *Helfter,* 115 F.3d at 617 (plaintiff only showed that she was restricted from performing a narrow range of jobs with substantial amount of sustained repetitive motion and heavy lifting); *Gutridge,* 153 F.3d at 901 (permanent lifting restriction only rendered plaintiff unable to perform his current position).

### 2. Qualified Individual/ Reasonable Accommodation

■ Even if all the plaintiffs could raise a triable issue that their physical impairments substantially limit them in a major life activity, plaintiffs' ADA claims nonetheless fail because none of the plaintiffs have demonstrated that they are qualified individuals with a disability.

Under the ADA, "a qualified individual with a disability means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Essential functions of a job are established by looking at the employer's judgment as to what functions are essential; written job descriptions; the amount of time spent on the job performing the functions; the consequences of not requiring the employee to perform the functions; and the work experience of employees in similar jobs. 29 C.F.R. § 1630.2(n)(3); 42 U.S.C. 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential."). Where a plaintiff is discharged from temporary light-duty assignments the focus is not on the essential functions of this temporary position, but on plaintiff's permanent position. *Browning v. Liberty Mut. Ins. Co.,* 178 F.3d 1043, 1048 (8th Cir.1999). *Braziel v. Loram*

*Maintenance of Way, Inc.,* 943 F.Supp. 1083, 1098 (D.Minn.1996). As the court in *Braziel* explained, if "an employer will be obligated to maintain the employment of disabled employees who have been given temporary, light-duty assignments, during a period of recuperation, then a disincentive to offer such beneficial employment opportunities will follow." *Id.*

In this case, plaintiffs cannot seriously argue, given their severe work restrictions, that they were qualified to perform the essential functions of the press operator position at the time they were placed on leave in 1999. As press operators, plaintiffs needed the physical ability to remove parts of varying weights from the press, cut off excess material, drill and weld parts, install any necessary inserts, pack the parts, and make boxes. The trimming, packaging, and repetitive motions of the position all required use of the wrists, shoulders and arms. The job description for the position expressly listed lifting of heavy parts and good hand and eye coordination as essential requirements.

Carlson and Kopp admit in their depositions that they were unable to perform the press operator position. *Graham v. Rosemount Inc.,* 40 F.Supp.2d 1093, 1100 (D.Minn.1999) (plaintiff not qualified where she "repeatedly stated that she is unable to perform her job because of the severity of her disability"). As for Lucking, she and her QRC determined that Lucking could not perform even the modified position Cookson offered her in January 2000.[15] Ciszewski testified that as of May 1999, everything she did with her arm caused her pain and she agrees that she could not have operated even the lighter presses with only one hand. Finally, Niesen testified that although she could work

---

**15.** The position entailed working only on smaller presses in the 100 Room. Even this position, however, was outside Lucking's work restrictions.

on some of the presses, she could not do so without violating her five-pound lifting restriction and aggravating her injury. Niesen's journal entries from the relevant time period also reveal that the clipping, trimming and constant repetitive motions of working the presses exacerbated her injury. On this record, the Court finds that plaintiffs have failed to demonstrate that they could perform the essential functions of their positions when Cookson decided that they could no longer accommodate their work restrictions.

Despite this conclusion, the Court must still consider whether plaintiffs could have performed the essential functions of the press operator position with a reasonable accommodation. Reasonable accommodation may include, but is not limited to, "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modifications of equipment or devices." 29 C.F.R. § 1630.2(o)(2)(ii). Under the ADA and as interpreted by this circuit, "the employee must specifically request the particular accommodation that he seeks." *Braziel*, 943 F.Supp. at 1099; *Lue v. Moore*, 43 F.3d 1203, 1206 (8th Cir.1994). Specifically, the plaintiff is required to make a facial showing that reasonable accommodation is possible. *Benson*, 62 F.3d at 1112. At that point, the burden of production shifts to Cookson to show that it is unable to make that accommodation. *Id.*

In this case, plaintiffs fail to point to any reasonable accommodations which would have enabled them to perform the press operator position. Ciszewski fails to present evidence that she could have been reassigned to a vacant position that did not require use of her one arm. Ciszewski testified that she knew of a full-time position training new hires at the plant which

would not have required using her right arm. However, when asked whether she knew if the job was vacant in July 1999, Ciszewski admitted that the position was currently filed by someone else. Because the ADA only requires employers to reassign qualified individuals to a vacant position, Ciszewski fails to make a facial showing that a reasonable accommodation in the form of reassignment was possible. (Emphasis added.) *Nesser v. Trans World Airlines*, 160 F.3d 442, 446 (8th Cir.1998) ("Because Nesser did not present any evidence that a vacant position was available in the Reservation Sales Department, he did not establish that a reasonable accommodation was available.").

Lucking similarly fails to articulate an accommodation that could have allowed her to perform the essential functions of the press operator position.[16] When asked at her deposition what possible jobs she could perform within the restrictions placed on her left arm, Lucking could only point to isolated tasks like inspecting smaller parts on various presses, updating the black books, putting folders together for pallets, and grinding some parts, but could not point to any full-time position. The ADA, however, does not require employers to create a new position or to create a permanent position out of a temporary one as an accommodation. *Fjellstad*, 188 F.3d at 950; *Benson*, 62 F.3d at 1114. Although, Lucking mentions that there was a supervisor position in the Anderson cell which she could have performed, the record reveals that the position had already been filled. Lucking also mentions elsewhere in her deposition that she could have filled a position as a tool crib attendant. However, she concedes that another employee occupied the position at the time. Although Lucking argues

---

**16.** Although Lucking's fixture room position was being eliminated due to restructuring, Poe considered Lucking for the available position of press operator.

that the individual then in this position "was out and dying," the court in *Braziel* rejected almost the identical argument. 943 F.Supp. at 1101 (employer not required to keep plaintiff employed until individual then occupying position retired).

Likewise, Carlson, who admitted that she could not perform her job as a press operator at the time Cookson placed her on leave, fails to identify an accommodation which would have allowed her to perform the essential functions of the press operator position. As with Lucking, Carlson only identifies isolated duties which she could have performed.[17] Carlson also fails to demonstrate that Cookson could have reassigned her to a vacant position. Although Carlson mentions that she could have worked as a forklift operator or a truck driver, Carlson admits she did not possess the required license to qualify for the position. 29 C.F.R. § 1630.2(*o*) (reassignment a possible accommodation if disabled employee is qualified for the vacant position); *Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 677 (7th Cir. 1998) ("It is well established under the ADA, the employer's duty reasonably to accommodate a disabled employee includes reassignment of the employee to a vacant position for which she [or he] is qualified."); *Willis v. Conopco*, 108 F.3d 282, 284 (11th Cir.1997) ("Reassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified."). Moreover, Carlson's lifting and light duty restrictions prevented her from performing the essential lifting and mobility requirements of any forklift position available at Cookson. Poe Aff. Exh. A & B (stating that physical demands of material handler positions require ability to "lift

up to 55 lbs to shoulder height, bending and twisting, pushing and pulling and use of both hands").

Like Carlson, Niesen identifies only particular products on smaller presses which she could have performed. Also, she fails to identify any vacant position to which Cookson could have reassigned her. Finally, Kopp expressly admitted in her deposition that she could not perform any of the available positions, even those outside the press operator position because they all require use of both hands.

### 3. Interactive Process

■ Because plaintiffs fail to make a facial showing that a reasonable accommodation was possible, plaintiffs' contention that Cookson violated the ADA by failing to engage in the interactive process also fails. Plaintiffs correctly state Eighth Circuit law when they argue that an employer's failure to engage in the interactive process, while not a *per se* violation of the ADA, can constitute prima facie evidence that the employer may be acting in bad faith. *Stern v. University of Osteopathic Medicine & Health Sciences*, 2000 WL 1133837, 220 F.3d 906, 909 (8th Cir.2000); *Fjellstad v. Pizza Hut of America*, 188 F.3d 944, 951–52 (8th Cir.1999); *Cravens v. Blue Cross Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir.2000).

However, these same decisions make clear that a plaintiff still carries the burden of sufficiently demonstrating that a reasonable accommodation would have made the plaintiff a qualified individual with a disability. *Fjellstad*, 188 F.3d at 952 (emphasizing that "employer will not be held liable under the ADA for failing to engage in an interactive process if no rea-

---

17. Specifically, Carlson describes certain products which come off the smaller presses and require no trimming. These products include frigidaire strips, elbows, Bessel boards.

sonable accommodation was possible"); *Stern*, 2000 WL 1133837, 220 F.3d at 908 ("Even if such an interactive process is required in an academic setting, we conclude that plaintiff nonetheless would have to establish that reasonable accommodations for his disability would render him qualified for the medical school program ... a showing plaintiff has failed to make"). As the Court has already found, plaintiffs have not carried that burden here. As a result, a discussion of whether Cookson failed to engage in the interactive process is unnecessary. Compare *Sterns*, 2000 WL 1133837, 220 F.3d at 908 (plaintiff's failure "to show that the modifications upon which he relied in his response to the university's motion for summary judgment would have accommodated his disability" rendered interactive process analysis irrelevant) *with Fjellstad*, 188 F.3d at 949–53 (considering employer's failure to engage in interactive process only after plaintiff raised issue of material fact that reassignment to vacant position was possible); *Cravens*, 214 F.3d at 1020–21 (same).

Thus, for all the foregoing reasons, defendant's motion for summary judgment on plaintiffs' ADA claim is granted.

### III. Retaliatory Discharge Claim

■ In Count II of their complaint, plaintiffs allege that they were discharged in retaliation for filing for Workers' Compensation Benefits. This action, plaintiffs' argue, violates Minn.Stat. § 176.82, subd. 1, which provides:

Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages incurred by the employee including any diminution in workers' compensation benefits caused by a violation of this section including costs and reasonable attorney fees, and for punitive damages not to exceed three times the amount of any compensation benefits to which the employee is entitled. Damages awarded under this section shall not be offset by any workers' compensation benefits to which the employee is entitled.

Minnesota law applies the three-part analysis of the *McDonnell Douglas* test to retaliatory discharge claims under § 176.82. *Benson v. Northwest Airlines, Inc.*, 561 N.W.2d 530, 539 (Minn.Ct.App. 1997). To establish a prima facie case of retaliatory discharge under Minnesota law, plaintiff must establish that 1) he or she engaged in statutorily protected activity; 2) an adverse employment action resulted; and 3) there is a causal connection between the two. *Kunferman v. Ford Motor Co.*, 112 F.3d 962, 965 (8th Cir.1997); *Dietrich v. Canadian Pac. Ltd.*, 536 N.W.2d 319, 327 (Minn.1995).

Defendant argue that plaintiffs cannot make out a prima facie case of retaliatory discharge.[18] Specifically, plaintiffs have not shown that an adverse employment action was taken against them. Cookson emphasizes that plaintiffs were not terminated in May 1999, but rather, were placed on workers compensation leave and continued to receive benefits. Defendant further contends that plaintiffs have not shown

---

**18.** Defendant also argues that plaintiffs' retaliatory discharge claim fails at its most basic level because plaintiffs have not demonstrated that Cookson actually denied or disrupted their workers' compensation benefits. *Flaherty v. Lindsay*, 467 N.W.2d 30, 32 (Minn. 1991) (holding that "some actual denial or disruption in the receipt of benefits must occur to warrant recovery" under § 176.82). In this case, the plaintiffs concede that they received workers' compensation benefits after being placed on leave in the spring of 1999.

any causal connection between the filing of their workers' compensation claim and any actionable employment action.

The Court finds that summary judgment against plaintiffs on this claim is appropriate. Even assuming, without deciding, that Cookson's decision to place plaintiffs on workers' compensation leave qualifies as an actionable adverse employment action, plaintiffs fail to establish the causation element. *Kunferman,* 112 F.3d at 965 (affirming district court's grant of summary judgment on retaliatory discharge claim for failure to present sufficient evidence of causation). Plaintiffs do not even address this element of their claim in their brief. Rather, plaintiffs merely assert, in conclusory fashion, that Cookson "targeted plaintiffs" during the alleged restructuring and discharged them because they had previously filed claims for workers compensation. A plaintiff cannot survive summary judgment on a retaliatory discharge claim under § 176.82 by merely stating that she sought workers' compensation benefits and was discharged. *Cruz v. Quality Pork Processors,* 1997 WL 30834 at *4, 1997 Minn.App. LEXIS 127 at *10 (Minn.Ct.App.1997). Plaintiffs' workers' compensation retaliation claim thus fails.

## IV. Gender Discrimination

In Count III of their complaint, plaintiffs assert a claim of gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Minnesota Human Right, Act ("MHRA"). Specifically, plaintiffs pursue their claim under a hostile work environment theory and a theory of disparate treatment. As discussed more fully below, the Court grants Cookson's request for summary judgment on plaintiffs' disparate treatment

theory, grants its motion on the hostile work environment of Lucking and Kopp, but denies the motion as to the hostile work environment claims of Niesen, Ciszewski and Carlson.

### A. Hostile Work Environment

The facts supporting the claim of Niesen, Ciszewski and Carlson [19] for sexual harassment are as follows and are presented in the light most favorable to plaintiffs, the non-movants.

During her first tenure at Cookson, Niesen encountered numerous instances of alleged harassment by several co-workers. Don Hamm, a mold tech, would make sexual jokes to her, rub up against her, and say such things as "Why don't you wear shorter shorts so we can all see your legs?" or "Why don't you wear tighter shorts?" Niesen also overheard Hamm say that he wanted "to bend girls over and do them." Niesen states that she told Hamm his comments were rude and he should stop making them. Niesen also complained of Hamm's behavior to other co-workers.

Les Haggard, another co-worker who worked with Niesen and other women in the Knoll cell, would tell Niesen and the others that they were his "Knoll cell babes," and that they needed to come and sit on his lap and that he should get them shirts that say "Knoll Cell" across their chests. Haggard also asked Niesen out, which made her uncomfortable. When Niesen's mother dropped off lunch for her at work, Haggard made comments such as, "Another pretty woman to take home with me," or comment on how beautiful they were, or how sexy her mother looked. When Niesen complained to Haggard that

---

**19.** Although Lucking and Kopp present evidence supporting their disparate treatment theory of discrimination, they fail to present any evidence to support a hostile work environment claim against Cookson. Accordingly, the Court dismisses these claims.

she did not approve of his comments, Haggard responded "Oh, come on. Just get over it. You're my Knoll cell babe. I mean, you're my worker, and I'll do what I want basically." Niesen also complained about Haggard's behavior to other co-workers.

During Niesen's second tenure at Cookson, the sexual comments and jokes continued. On one occasion, Jeff Kuehn ("Kuehn"), another co-worker, made a comment in the lunchroom that Niesen's wrists hurt from "jacking off her boyfriend." Kayla Roberts, Niesen's supervisor, was present when this comment was made and apparently laughed with the others. When Niesen learned of Kuehn's comments, she told Roberts that the comment was inappropriate and that Roberts should do something about it. According to Niesen, Roberts simply rolled her eyes and said, "I'll take care of it later." But Niesen never received a response. After the initial incident, Kuehn walked past Niesen and on roughly ten occasions, said to her, "Are you jacking off your boyfriend?"

Jason Brandt, another mold tech, always told Niesen that she looked sexy and that "he'd like to do [her]." Another co-worker, Ryan Furey, talked to Niesen about having sex with larger women "because they had more cushion" and that he liked to find strippers "because they had more experience." Jon Noga, another press operator, made comments about how he liked a coworker and went into detail as to what

he would like to do with her in a sexual manner.

Niesen not only spoke with Roberts about the incidents; she also attempted to contact Karleen Crocker, Cookson's Human Resource Manager. However, according to Niesen, Crocker would not return her messages, even though in one message Niesen expressly told Crocker she wanted to make a complaint of sexual harassment.

Ciszewski's factual allegations in support of her sexual harassment claim stem primarily from the actions of Kuehn. According to Ciszewski, Kuehn "told sexual jokes all the time." [20] told her often that she looked "nice," would brush up against her "a lot," and on one occasion, as Ciszewski leaned over a table to unplug a fan, Kuehn said to her, "Boy, I'd like to bend you over the table." Ciszewski complained to Les Haggard, a mold tech at Cookson, and also spoke to other co-workers about Kuehn's behavior.

Ciszewski also witnessed another male employee frequently harassing a female co-worker. She overheard him tell the co-worker that he wanted her to leave her husband and move in with him. He followed the co-worker to her car after work. If she did not talk to him, he kicked over buckets and threw things. On another occasion, Ciszewski was present when Gary Nelson, a Cookson supervisor, told one of Ciszewski's co-workers that she was "just a fuckin' bitch." When asked whether she ever complained to management about these events, Ciszewski said she

---

**20.** At her deposition, Ciszewski recalled three sexual jokes that Kuehn told her:

1. Kuehn: "If you went camping and got drunk and passed out and woke up the next morning and you had a condom hanging out of your ass, would you tell anybody?"
 Ciszewski: "No."
 Kuehn: "Do you want to go camping?"

2. "Do you know what speaks French and likes to eat pussy?"
 "Mot."

3. "Do you know the difference between breakfast and sex?"
 No.
 "Would you like to come to my house for breakfast?"

did not because she was afraid of retaliation and, in any event, it would be futile to say anything since complaints were always ignored.

Carlson's allegation, of harassment also stem primarily from the conduct of Kuehn. According to Carlson, Kuehn told "dirty jokes" and "blonde jokes" on roughly 20 or 30 occasions. Kuehn also bumped or rubbed against Carlson and excused himself by stating that he needed to get to the press. On other occasions, Kuehn turned around and walked by Carlson with his hands up toward Carlson's chest and purposely bumped into her, saying "Excuse me. Oh, I didn't know you were there." Even if she was walking down a wide hallway, he veered off toward her with his hands at chest level to bump into her. Kuehn would laugh when Carlson would tell him to "knock it off." On one occasion, after Carlson located some missing parts, Rollin Nelson, her supervisor, said to her "I'm so happy could just kiss you, but I better not do that because it's sexual harassment. I'll let Les Haggard kiss you instead." Although Carlson admits she knew that Cookson had an anti-harassment policy which instructed employees who felt harassed to report such incidents,[21] she nonetheless did not report these incidents because she felt that Rollin Nelson, her supervisor, would reprimand

her if she did, as he had done in the past when Carlson brought up other matters regarding him at meetings.

To succeed on a claim of hostile work environment by non-supervisory co-workers, a plaintiff must establish that 1) she belongs to a protected group; 2) she was subject to unwelcome sexual harassment; 3) the harassment was based on sex; 4) the harassment affected a term, condition, or privilege of employment; and 5) the employer knew or should have known of the harassment and failed to take proper remedial action. *Scusa v. Nestle U.S.A. Co., Inc.,* 181 F.3d 958, 965 (8th Cir.1999); *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir.1998); *Hall v. Gus Constr. Co., Inc.,* 842 F.2d 1010, 1013 (8th Cir. 1988).[22]

Plaintiffs, all women, are clearly members of a protected group. There also appears to be no dispute that the alleged behavior was unwelcome or that it was based on sex. Cookson does contend, however, that plaintiffs' hostile environment claim fails as a matter of law because the alleged harassment was neither severe nor pervasive.

**1. Severe or Pervasive**

■ "Harassment affects a term, condition or privilege of employment if it is

---

**21.** All three plaintiffs received a copy of Cookson's employee handbook which contained an equal employment opportunity policy as well as the following policy prohibiting sexual harassment.

Cookson Plastic Molding is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age, religion, or any other legally protected characteristic will not be tolerated ...

Any employee who wants to report an incident of sexual or other unlawful harassment should promptly report the matter to his or her supervisor. If the supervisor is

unavailable or the employee believes it would be inappropriate to contact that person the employee should immediately contact the Human Resources Manager or any other member of management. Employees can raise concerns and make reports without fear of reprisal...

**22.** Courts generally apply the same standards applicable to federal Title VII claims when analyzing claims raised under the MHRA. *See Williams v. Metropolitan Waste Control Comm'n,* 781 F.Supp. 1424, 1426 (D.Minn. 1992) (enumerating the basic elements of an MHRA hostile environment claim).

'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howard*, 149 F.3d at 840 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). To demonstrate this, plaintiff "must show that the sexual harassment created an environment that was both objectively and subjectively abusive." *Henderson v. Simmons Foods Inc.*, 217 F.3d 612, 616 (8th Cir.2000). Factors to consider in determining whether the complained-of conduct is sufficiently severe or pervasive include: 1) the frequency of the discriminatory conduct; 2) its severity; 3) whether it is physically threatening or humiliating, or a mere offensive utterance; and 4) whether it unreasonably interfered with an employee's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

Title VII, however, is not a general civility code. *Scusa*, 181 F.3d at 967 ("Appellant's lawsuit represents an attempt to impose a code of workplace civility under Title VII."). "Simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions' of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "There is no bright line between sexual harassment and merely unpleasant conduct." *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir.1997).

Upon review of the above-factors and the record as a whole, the Court finds that plaintiffs have individually presented sufficient evidence on their claims from which a reasonable jury could find that the offensive conduct in question was sufficiently severe or pervasive as to alter plaintiffs' conditions of employment.

Niesen was subjected to frequent sexual comments from numerous co-workers throughout the plant, and particularly humiliating comments from Kuehn, who not only made the comment in front of Roberts, but subsequently repeated the highly offensive comment to Niesen on numerous occasions.

Ciszewski was also subjected to frequent verbal abuse. Kuehn berated Ciszewski with sexual jokes "all the time." Moreover, the three jokes that she specifically recounted at her deposition and his comment to her as she bent over a table were highly offensive. Ciszewski also witnessed harassment of other employees, including verbal abuse by a Cookson supervisor. The Eighth Circuit has "considered harassment of employees other than the plaintiff to be relevant to show pervasiveness of the hostile environment." *Howard*, 149 F.3d at 838 *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1015 (8th Cir.1988).

Like Ciszewski, Carlson was the frequent target of Kuehn's "dirty jokes." Carlson's allegations also include the aggravating factor of unwanted physical contact. As Carlson recounts, Kuehn often bumped into Carlson with his hands at chest level at the press or in the hallway. *Howard*, 149 F.3d at 840 ("Two aggravating factors are present, unwanted physical contact ... and frequency of the conduct").

There is also evidence that all three plaintiffs considered the conduct subjectively offensive. Niesen made her displeasure to this recurring behavior known by telling Hamm and others to stop and trying to report Kuehn's behavior to upper management. Ciszewski spoke with her coworkers about Kuehn's behavior and Carlson told Kuehn himself to "knock it off." There is also no evidence in the record that plaintiffs themselves ever engaged in similar conduct. *Scusa*, 181 F.3d at 967 ("appellant's evidence of a hostile work environment falls flat in light of the

fact that she engaged in the very type of conduct about which she now complains").

"Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." *Howard,* 149 F.3d at 840. Indeed, the Eighth Circuit has found sufficient evidence to support a jury verdict in favor of a plaintiff's hostile environment claim on facts similar to those present here. *Id.* at 840–41 (affirming jury verdict where co-employee was "always saying sexual innuendos," telling plaintiff she had nice legs, intentionally brushing up against her, and telling jokes).

## 2. Knew or Should Have Known

■■■ As previously stated, employers may be held liable on a claim of sexual harassment by a coworker only if the plaintiff establishes that the employer "knew or should have known of the harassment and failed to take immediate and appropriate action." [23] Under this standard, courts must ask two questions, first, whether the employer had actual or constructive knowledge of the harassment, and second, whether the employer took adequate remedial or preventative responses to any actually or constructively known harassment. *Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999).

At the outset, the Court notes that Niesen has presented sufficient evidence to support a finding that Cookson had actual knowledge of the alleged harassment against her. Niesen not only told Roberts, her supervisor, that something had to be done about Kuehn's behavior, but she also left a message with Crocker, the Human Resources Director, that she wanted to make a claim of sexual harassment.

Unlike Niesen, however, neither Ciszewski nor Carlson reported the harassment to upper management. In fact, they expressly admit that they did not make a report to higher management either because they feared retaliation or believed nothing would be done. Thus, Cookson can be held liable for the harassment of Ciszewski and Carlson only if Cookson had constructive knowledge of the harassment. According to several courts that have specifically addressed this issue, "if a plaintiff points to specific facts which would indicate that harassment by coworkers is widely pervasive, such facts could support an inference of constructive knowledge by the employer." *Henderson v. Whirlpool Corp.,* 17 F.Supp.2d 1238, 1244 (N.D.Okla. 1998); *P. v. Delta Air Lines, Inc.,* 102 F.Supp.2d 132, 140 (E.D.N.Y.2000) ("[w]hen an employer is aware of evidence of sexual harassment against other employees 'that is similar in nature and near

---

**23.** Employer liability for claims of sexual harassment differ depending on the employment status of the alleged harasser. *Palesch v. Missouri Comm'n on Human Rights,* 233 F.3d 560, 566 n. 5 (8th Cir.2000) (explaining the different legal standards of employer liability depending on whether the alleged harasser is a supervisor or a co-worker). Under two recent Supreme Court decisions, if the employee is a supervisor, then an employer will be held vicariously liable for that employee's conduct, subject only to a two-part affirmative defense. *Faragher,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."). However, if the employee is a co-worker, as is the case here, then an employer is liable for the conduct of that employee only if plaintiff demonstrates that the employer "knew or should have known of the harassment and failed to take immediate and appropriate action."

in time' to the plaintiff's allegations this too may be sufficient to establish notice.'") (quoting *Hirase–Doi v. U.S. West*, 61 F.3d 777, 784 (10th Cir.1995)).

Under these standards, the Court believes there is sufficient evidence in this record upon which a factfinder could find that the harassment was pervasive enough that Cookson was constructively on notice of the harassment. There is already evidence in the record that Cookson knew of some harassment in the plant through Niesen. It is also particularly significant that Niesen expressly complained about Kuehn, the same employee who was allegedly harassing Ciszewski and Carlson. Additionally, when viewed as a whole plaintiffs' allegations could be sufficiently pervasive as to support an inference of constructive knowledge. As the Eighth Circuit has repeatedly emphasized, "evidence of a hostile environment must not be compartmentalized, but must instead be based on the totality of circumstances of the entire hostile work environment." *Gillming v. Simmons Indus.*, 91 F.3d 1168, 1172 (8th Cir.1996); *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir.1992).

Thus, for all the above stated reasons, the Court finds that genuine issues of material fact foreclose summary judgment on Ciszewski, Carlson and Niesen's hostile work environment claims.

### B. Disparate Treatment

█ Finally, plaintiffs allege that Cookson intentionally discriminated against plaintiffs in the terms, conditions, and privileges of their employment because of gender. *Palesch* 233 F.3d at 568 ("Title VII ... prohibits employers from treating employees differently with respect to the 'terms, conditions or privileges' of employment."). To support their theory, plaintiffs complain of a continuing and con-

sistent pattern that Cookson treats men more favorably than women. According to plaintiffs, men are promoted faster, treated better and taken more seriously at the plant. If men have an injury, they are treated properly, accommodated and not called "whining bitches." Plaintiffs also believe, among other things, that women are disciplined more often than men, men get to work on the easier presses with less lifting than the women, and men get to go home first if there is not enough work to do.

To state a claim of disparate treatment, the Court follows the familiar *McDonnell Douglas* burden shifting model, which requires plaintiff to establish both a prima facie case of sex discrimination and that defendant's legitimate nondiscriminatory basis for its decision was a pretext for sex discrimination. *Callanan v. Runyun*, 75 F.3d 1293, 1297 (8th Cir.1996). As in all disparate treatment cases, no matter what the theory, "the ultimate question .. is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

Plaintiffs fail to proffer sufficient evidence in this case to permit a finding of intentional gender discrimination on any of the allegations plaintiffs raise to support this claim. Plaintiffs' allegation that men are promoted faster than women at Cookson is based on nothing more than a plaintiffs' generalized and conclusory belief that such is the case. Plaintiffs have not presented any evidence that they applied for a promotion for which they were qualified but were passed over by a male candidate. Indeed, Lucking admits that she never applied for a promotion. *Chambers v. Wynne School Dist.*, 909 F.2d 1214, 1218 (8th Cir.1990) ("because the plaintiff made no attempt to apply or even inquire as to

the position before it was filled, the district court did not clearly err in finding that no prima facie case had been made with respect to this opening."). The same is true of Ciszewsk, and Kopp, Carlson bases her claim in part on her allegation that Cookson unfairly promotes men to the mold tech positions, but she herself admits that she was physically unable to perform the duties of the position due to her medical restrictions.

Plaintiffs' other allegations of gender discrimination also fail because they do not demonstrate that the men who were treated more favorably were "similarly situated" to them. The test for whether employees are "similarly situated" to warrant a comparison to a plaintiff is a rigorous one and these plaintiffs have not satisfied it. *Palesch*, 233 F.3d at 568 (summary judgment proper where plaintiff failed to present "specific, tangible evidence" to demonstrate a disparity in treatment between similarly situated employees).

The allegations plaintiffs raise here are not unlike the unsuccessful complaints raised in *Callanan v. Runyun*, 75 F.3d 1293 (8th Cir.1996). In *Callanan*, the plaintiff, who worked as a part-time letter carrier, complained that she received less desirable job assignments than her male counterparts, on one occasion she was referred to as a "bitch" by a fellow employee, and she was disciplined more often and more severely than the male carriers. *Id.* at 1295. The Eighth Circuit affirmed the district court's dismissal of plaintiff's claim after a six-day bench trial, concluding that plaintiff "has utterly failed to prove that the Postal Service intentionally discriminated against her because of her gender." *Id.* at 1297

Plaintiffs have simply failed to produce sufficient evidence to maintain their disparate treatment claim. While plaintiffs correctly note that they are entitled to all reasonable inferences in their favor as the non-moving party in this motion, it is also true that plaintiffs cannot simply rest on their bare allegations to defeat summary judgment, but rather must come forth with evidence demonstrating that a triable issue exists for trial. Plaintiffs have failed in this regard. Accordingly, summary judgment on this claim is warranted.

## ORDER

Based upon the foregoing the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's motion to strike affidavits [Docket No. 27] is **GRANTED** and the following portions of affidavit testimony is **STRICKEN**:

 a. Laura Carlson's Affidavit, paragraphs 1, 2 and 4;

 b. Sally Ciszewski's Affidavit, paragraphs 2, 4, 5, 10, 11, 12, and 14

 c. Faye Kopp's Affidavit, paragraphs 1, 2, 3, 4, 5, 8, and 11

 d. Judy Lucking's Affidavit, paragraphs 3, 4, 5, and 6

 e. Kathryn Niesen's Affidavit, paragraphs 4, 5, 6, and 8.

2. Defendant's motion for summary against Laura Carlson [Docket No. 11] is **GRANTED** with respect to her disability discrimination claim (Count I), retaliatory discharge for seeking workers' compensation benefits claim (Count II) and gender discrimination claim (Count III) premised on a disparate treatment theory. Counts I and II and that portion of Count II are **DISMISSED WITH PREJUDICE.** Defendant's motion is **DENIED** as to plaintiff's hostile work environment claim in Count III.

3. Defendant's motion for summary against Sally Ciszewski [Docket No. 14] is **GRANTED** with respect to her disability

discrimination claim (Count I), retaliatory discharge for seeking workers's compensation benefits claim (Count II) and gender discrimination claim (Count III) premised on a disparate treatment theory. Counts I and II and that portion of Count III are **DISMISSED WITH PREJUDICE.** Defendant's motion is **DENIED** as to plaintiff's hostile work environment claim in Count III.

4. Defendant's motion for summary against Faye Kopp [Docket No. 16] is **GRANTED** in its entirety and all claims asserted by her are **DISMISSED WITH PREJUDICE.**

5. Defendant's motion for summary against Judy Lucking [Docket No. 18] is **GRANTED** in its entirety and all claims asserted by her are **DISMISSED WITH PREJUDICE.**

6. Defendant's motion for summary against Kathryn Niesen [Docket No. 20] is **GRANTED** with respect to her disability discrimination claim (Count I), retaliatory discharge for seeking workers compensation benefits claim (Count II) and gender discrimination claim (Count III) premised on a disparate treatment theory. Counts I and II and that portion of Count III are **DISMISSED WITH PREJUDICE.** Defendant's motion is **DENIED** as to plaintiff's hostile work environment claim in Count III.